# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| **UNITED GROUP PROGRAMS, INC.,** | ) | Case No. 25-11531 (TMH) |
| | ) | Hearing Date:  TBD |
| Debtor. | ) | Objection Deadline: Sept. 23, 2025 at 4:00 p.m. |
| | ) | |

## EMERGENCY MOTION OF SHELTERPOINT LIFE INSURANCE COMPANY (i) GRANTING RELIEF FROM THE AUTOMATIC STAY FOR CAUSE TO TERMINATE MANAGING GENERAL AGENCY AND MARKETING SERVICES AGREEMENT; (ii) PROHIBITING DEBTOR'S DESTRUCTION OR TRANSFER TO ANY THIRD PARTY OF SHELTERPOINT LIFE INSURANCE COMPANY'S PROPERTY, AND (iii) COMPELLING TURNOVER OF SHELTERPOINT LIFE INSURANCE COMPANY'S FUNDS AND PROPERTY HELD BY DEBTOR

ShelterPoint Life Insurance Company ("SPL")[1] hereby respectfully requests entry of an order, substantially in the form attached hereto as Exhibit "A" (the "Proposed Order"), granting the relief described below.  In further support of the Motion, SPL states the following:

### RELIEF REQUESTED

1.      By this Motion, SPL respectfully requests entry of the Proposed Order (a) lifting, modifying and/or annulling the automatic stay imposed pursuant to Section 362(a) of title 11 of the United States Code (the "Bankruptcy Code") for cause to allow SPL to terminate its Managing General Agency and Marketing Services Agreement (the "SPL Agreement") with debtor United Group Programs, Inc. ("UGP" or "Debtor"), pursuant to

---

[1] ShelterPoint Life Insurance Company ("SPL") is a New York domiciled insurer.  It has a subsidiary, ShelterPoint Insurance Company, a Florida domiciled insurer ("SPI"; collectively with SPL, "ShelterPoint").  Pursuant to separate Managing General Agency and Marketing Services Agreements, SPL and SPI each currently use debtor United Group Programs, Inc. ("UGP") as a third-party administrator ("TPA") to administer Shelterpoint's Group Supplemental Medical Expense ("Gap") product, which is available in Michigan through SPL, and in 36 additional states through SPI.  SPI has separately but contemporaneously filed its own motion for relief mirroring this Motion other than with regard to particularized facts applicable to one but not the other ShelterPoint company.

which UGP has served as a third-party administrator for SPL, based on, *inter alia*, UGP's cessation of business and resulting nonperformance of its contractual duties; (ii) enjoining UGP from destroying, or from transferring to any third party or parties, whether as part of a sale or otherwise, SPL's proprietary data, books and records (collectively, the "SPL Data") now held by UGP for the benefit of SPL under the SPL Agreement; and (iii) compelling UGP to release and pay over to SPL all funds of SPL held, pursuant to the SPL Agreement, in bank accounts for the benefit of SPL but under UGP's control, net of any agreed amounts owed to UGP.

## JURISDICTION AND VENUE

2.     The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(b)(2)(G) and (O) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.

3.     This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of Debtor's Chapter 7 proceeding and of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The legal predicates for the relief requested herein are sections 105(a) and 362(d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9014.

5.     SPL consents, pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by this Court on this Motion in the event that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with this Motion consistent with Article III of the United States Constitution.

ME1\57900030.v1

# BACKGROUND

6.    On or about October 17, 2017, SPL entered into the SPL Agreement with UGP.  A true and correct copy of the SPL Agreement is attached hereto as Exhibit "B".[2] Pursuant to the SPL Agreement, SPL engaged UGP as a third-party administrator to perform certain managing general agency and marketing services for SPL in connection with SPL's group supplemental medical expense insurance business as set forth more specifically in the SPL Agreement.  Although SPL is acknowledged in the SPL Agreement as the ultimate decisionmaker and authority regarding the Business[3], UGP agreed to adopt and implement rules, regulations, procedures, guidelines, pricing methodologies, rates, forms and marketing materials with regard to the solicitation, administration and servicing of supplemental medical insurance policies and certificates as determined by SPL from time to time. (See Ex. B, Section 2). SPL's Gap Plan coverage provides critical financial protection to its insured members by reimbursing out-of-pocket health care expenses including deductibles, copays, and coinsurance not paid by their major medical plans.

7.    In the SPL Agreement, among other duties, UGP agreed that it would, "acting in a fiduciary capacity on behalf of SPL, bill for and collect all gross premiums and/or third party fees and/or association dues for all coverages issued with respect to the Business and process such premiums and fees" pursuant to the SPL Agreement.  (See Ex. B at Section 7(a)).  Collected premiums and all other funds arising from or related to the

---

[2] Reference in this Motion to any one provision of the SPL Agreement is not intended to waive or derogate the effectiveness and enforceability of any other provision of the SPL Agreement, all of which are expressly reserved.

[3] "Business" is defined in the SPL Agreement as "the group supplemental medical insurance Policies and Certificates (including, without limitation any riders), issued by SPL that are administered by UGP pursuant to this Agreement as communicated to UGP by SPL from time to time in writing (sometimes referred to [in the SPL Agreement] as 'Gap Plan(s)')." As of July 31, 2025, there were more than 1,500 individuals covered under active SPL Gap Plans.

SPL Business were segregated from the funds of any other insurers and deposited for SPL's benefit into a Premium Account, Holding Account and Claim Account (collectively, as described more specifically in the SPL Agreement, the "Accounts"). (See Ex. B, Section 9(a); UGP's Statement of Financial Affairs ("SOFA") [Doc.4], Part 11 at 21.8, 21.9 & 21.14 )[4] (acknowledging SPL's ownership of the funds on deposit); Schedule A/B [Doc.3], Part 1 at 3.8, 3.9 & 3.14) (identifying segregated Accounts)).

8.      UGP agreed to audit the Premium Account and make periodic reports as directed by SPL, including in arrears on the 15th day after the end of the preceding month. (See Ex. B, Section 9(b)(x)).

9.      UGP also agreed to perform enumerated claims services on behalf of SPL in accordance with "SPL's claim practices, procedures, and claims payment standards as provided by SPL, in strict compliance with all applicable laws, rules and regulations." (See Ex. B, Section 8(a)).  Such activities included, "[f]or all valid claims under the Policies, pay benefits to Insureds entitled to payment, to the extent funds have been deposited in the Claims Account, and in accordance with all applicable laws, rules, and regulations, including without limitation, prompt pay requirements."  (See Ex. B, Section 9(c)(1)).  Additionally, UGP agreed in the SPL Agreement to provide telephonic customer service for producers, policyholders and insureds "to call to obtain answers to any questions with regard to the Business." (See Ex. B, Section 10(d)(i)).

10.      The SPL Agreement makes clear, in Section 11, that UGP was to prepare and maintain complete books and records for all issued policies for at least seven years from the date of each policy's termination, as well as records of all commissions paid to

---

[4] The SOFA labels all of the ShelterPoint Accounts as belonging to "ShelterPoint Life Insurance/Protective", but by cross-references the Schedules, it is clear that three of the accounts hold funds of SPL, and three hold funds of SPI.

producers, all transactions between UGP and providers, insureds or producers, and all transactions between UGP and SPL (see Ex. B, Section 11(a)). The SPL Agreement makes clear that the interests of SPL in and to such books and records are paramount:

> SPL retains the right to continuing access to the books of UGP needed by SPL to fulfill all its obligations under the Policies and/or law. All records maintained by UGP for the Business shall be made available to SPL during normal business hours for review, inspection and examination in a form consistent with the way they are maintained and in a form usable to SPL. SPL shall have access and the right to copy all accounts and records related to the Business in a form usable by SPL and New York Superintendent of Financial Services shall have access to all books, bank accounts and records of UGP in a form usable by the Superintendent. Such records shall be retained according to Part 243 of New York Insurance Regulation 152, except where this Agreement provides for more stringent record keeping requirements; …**All books and records regarding the Certificates and the Business generally are SPL's property.** UGP shall not destroy or transfer such books and records without written authorization by SPL. … SPL may take possession of said books and records … at any time UGP ceases operations or is no longer capable of maintaining the same, provided that SPL pays the costs of delivery thereof.

(See Ex. B., Section 11(c), (d)) (emphasis added). SPL also holds the right to audit "the operations, books and accounts of UGP relative to the business … at reasonable times … on site at UGP …". (See Ex. B, Section 13(a)).

11. Section 12 of the SPL Agreement, addressing Reports and Remittances, emphasizes the critical need for timely reporting to SPL and acknowledges that the New York Superintendent of Financial Services and other governmental authorities in other states "require periodic and ad hoc reporting of data from SPL regarding business written and administered under [the SPL] Agreement." To that end, UGP agreed to "compile any data so-required without delay and in the appropriate format and will forward the same to SPL for submission to the state." (See Ex. B, Section 12(c)). UGP also is responsible

5

"for compiling and forwarding to SPL all required data for all periodic reports with ample time for SPL to prepare and submit the required reports to the state prior to deadlines." *Id.* The SPL Agreement imposed similar obligations on UGP related to any required reporting of claims data and eligibility to units of the Federal government. *Id.*

12.     Section 12 also obligates UGP to provide monthly reports to SPL showing, at a minimum, gross premiums, policy-related expenses, valid paid claims and claims investigation expenses, and Loss Adjustment Expenses (as defined in the SPL Agreement) for the prior month. (See Ex. B, Section 12).

13.     In Section 13(b), UGP agrees to provide to regulatory authorities upon request all financial data applicable to the Business under UPG control, with approval by SPL. (See Ex. B, Section 13(b)).

14.     Section 21(b)(1) provides that the SPL Agreement "shall terminate at the option of SPL on the date specified by SPL on the occurrence of … [c]essation of UGP's business."[5] (See Section B, Section 21(b)(1)).

15.     Under applicable health and related insurance laws and regulations administered by each applicable state insurance regulatory authority, UGP is required to maintain active third-party administrator licenses where required to provide certain administrative services (e.g., directly or indirectly underwriting business, collecting premiums, and adjudicating claims) to insurers such as SPL, including in the state of Michigan, the only state in which SPL offers Gap Plans. *See* M.C.L.A. 550.910, Section

---

[5]  Section 21(b) also provides that UGP's failure to comply with the provisions of the SPL Agreement is a basis for termination, to the extent not remedied within thirty (3) days after SPL's written notice to UGP; however, the automatic stay prevents SPL from giving such notice, even though it is warranted. Additionally, the SPL Agreement is terminable at will upon three months' written notice, but SPL is also prohibited by the automatic stay from giving such notice.

10 ("(1) A person shall not operate as a third party administrator without obtaining and maintaining a certificate of authority pursuant to this act. (2) A third party administrator shall continue to meet the requirements of this act at all times."); *see also* Ex. B, Section 17(b) ("Where required by law, UGP shall hold all necessary licenses or certificates of registration as a Third Party Administrator or Independent Adjuster ('TPA') issued by the Department of Insurance or other applicable regulatory body."). Any failure of UGP to hold and maintain such licensure is a breach of the SPL Agreement, as well as a violation of applicable law. (Ex. B, Section 12(a) ("UGP will at all times be in compliance with all federal, state and local laws, statutes, rules and regulations…").

16.    In early June 2025, UGP informed SPL in writing that it intended to file bankruptcy. (See Declaration of Jeffrey Wasco, attached hereto as Exhibit "C", at ¶ 7.)

17.    Subsequently, UGP requested that SPL work with it in potentially transitioning existing policyholders to new administrative partners, identifying CarynHealth Solutions, LLC ("CarynHealth"), which SPL did. (Ex. C, at ¶ 8.) At the time, SPL understood that CarynHealth did not hold the required TPA licensure in Michigan, the only state in which SPL offers Gap Plans, and that another entity, Coordinated Benefit Plans, LLC ("CBP"), was to handle any administrative services requiring such licensure. (Ex. C, at ¶ 9.)

18.    SPL participated cooperatively in a due diligence review on CBP and CarynHealth as requested by UGP; however, certain of SPL's requests for information, particularly from CarynHealth, remain outstanding despite repeated requests over weeks and months. (Ex. C, at ¶ 10.)

ME1\57900030.v1

19.     On August 15, 2025, UGP filed its petition initiating this proceeding (the "Petition Date"),

20.     On August 25, 2025, SPL learned through a telephone conversation with UGP's Chief Operating Officer, Tim Dewey, that UGP had filed for chapter 7 the prior week, although the date of filing was not provided.  (Ex. C, at ¶ 13.) Dewey further advised that Gap claims were no longer being processed by UGP, but he could provide no detail of the date claims stopped being processed, or when or if claims processing would resume.  *Id*.  Dewey surmised that claim administration might resume in October, but he could provide no commitment that it would, in fact, resume, or any date certain when operations might restart. *Id*.

21.     Since the Petition Date, UGP has not, to SPL's knowledge, performed any of its duties under the SPL agreement and has not responded to requests from SPL for information or access to the SPL Data. (Ex. C, at ¶ 14.) To the best of SPL's knowledge, UGP has halted its business activities, at least as they pertain to the SPL Agreement. *Id*.

22.     Even prior to the Petition Date, UGP was not in compliance with its reporting duties under the SPL Agreement, and nothing has happened after the Petition Date to change that. (Ex. C, at ¶ 15).   For example:

    a.      UGP's Audited Financials for 2024 were requested on numerous occasions and not provided. There were multiple written requests for the Audited Financials from SPL that were ignored over the month of May. The Audited Financials remain outstanding. *Id*.

    b.      On April 9, 2025, SPL requested, by May 2, 2025, policy and claims-related data necessary for SPL to complete its NAIC Market Conduct Annual Statement (MCAS) Reports for submission to multiple state Insurance Departments, to be completed and returned to SPL by May 2, 2025.  This request was not completed by UGP until May 23, 2025, leaving only one week for SPL's review and timely submission of this critical report. *Id*.

8

c.    Routine Monthly Reporting has not been received:

      i.    Premiums and Claims data were last received for July and remains outstanding for August;

      ii.    Claims bordereau[6] information has not been received for August;

      iii.    Bank Statements and Account Reconciliations have not been received for the months of July and August; and

      iv.    Service Level Agreement (SLA) Reporting has not been provided for June, July and August.  *Id.*

23.    On August 18, 2025, Jami Nimeroff was appointed as chapter 7 trustee (the "Trustee") by order of this Court. [Doc.7].  As would be expected, the Trustee is not, on information and belief, operating UGP's business; certainly, the Trustee is not performing the duties of UGP under the SPL Agreement. (Ex. C, at ¶ 16.)

24.    Since the Petition Date, SPL has received numerous calls from brokers asking how insureds should submit claims and whether the Gap Plans were being serviced. (Ex. C, at ¶ 17.)  SPL has received no communication or instruction from UGP in this regard.  *Id.*=

25.    UGP's bankruptcy filing and the resulting freeze of the Accounts that UGP holds for SPL under the SPL Agreement in a fiduciary capacity has caused SPL economic hardship and put SPL at risk of not being able to pay claims without an alternate method of funding such payments. (Ex. C, at ¶ 19.)

**ARGUMENT**

26.    As a result of its termination of operations, UGP has failed completely to perform, and in fact appears to be incapable of performing, its duties under the SPL

---

[6]  In the insurance industry, a bordereau is a detailed report containing specific information about a group of policies or risks, such as premium amounts and loss data. These reports are submitted regularly by one party (like a managing general agent) to another (like an insurer or reinsurer) to provide transparency and enable proper risk assessment and tracking.

Agreement. No marketing is being done, no premiums are being collected and employed as needed for the benefit of policyholders, no claims are being processed, no customer service is being provided to insureds, and no records or data are available to SPL or its regulators or auditors. (Ex. C at ¶ 18.) SPL has, through counsel, specifically requested access to critical SPL Data,[7] which SPL owns and to which it is clearly entitled under the SPL Agreement, but UGP has failed or refused, or is unable, to provide such access as mandated under the SPL Agreement. Even assuming SPL had access to filed claims, without information regarding whether premium payments have been received, SPL has no way of knowing whether coverage is even in force. (Ex. C at ¶ 21.) And, to the extent SPL could determine that valid claims have been presented against in-force policies, SPL would be called upon to pay benefits without having received premiums – amounts that remain in accounts under the control of UGP – causing undue economic hardship for SPL to the detriment of all policyholders and insured members. (Ex. C at ¶ 22.)

27.    All parties are at risk in this scenario, including insureds who have paid their premiums but are not having their claims paid, and SPL, who is potentially exposed by UGP's protracted inaction if agreed coverage is not provided on a timely basis and if it remains unable to provide its regulators with access to its data in a timely manner, as required.

28.    The SPL Agreement should be terminated immediately to allow SPL to take on the duties previously performed by UGP or to transfer the Business to a new, licensed

---

[7] SPL requested year-to-date claim files, policyholder records, premium collection statements/invoices and supporting documentation, commission statements and supporting documentation, monthly appeals and complaint logs and files for year-to-date, plus financials for August 2025 (premium billed, collected premium, eligibility, paid claims), and bank statements for July and August 2025 – all critical SPL data held by UGP that should, under the SPL Agreement, be available to SPL (or its regulators or auditors) on request.

third-party administrator that is operational and in good standing, in either case to ensure that all needs of SPL and its insureds are met appropriately. These matters cannot be left to languish indefinitely with UGP, which is undeniably incapable of performing critical, time-sensitive duties under the SPL Agreement as agreed. That termination should include an immediate transfer to SPL or to a new third-party administrator chosen by SPL of all SPL Data formerly under the care of UGP for SPL's benefit, as well as all funds associated with the Business currently held in UGP accounts, net of any fees owed to UGP as of the Petition Date.[8]

29.     Additionally, UGP is holding an unknown amount of SPL's funds – at least $107,326.65, based on UGP's Schedules and Statement of Financial Affairs – in accounts to which SPL has no access, despite UGP's express acknowledgment that such funds are "property that the debtor holds or controls that another entity owns" that are held in fiduciary accounts in trust for the benefit of SPL. (See SOFA, Part 11, at 21.8, 21.9, & 21.14). SPL is entitled to the release of such funds so that those dollars can be appropriately deployed for their intended purpose under the Gap Policies.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

A.      **SPL is entitled to relief from the stay for cause to terminate the SPL Agreement.**

1.      As the Court well knows, subject to the court's approval, a trustee generally may assume or reject any executory contract of the debtor, 11 U.S.C. § 365(a), and pursuant to Section

---

[8]  SPL does not concede that fees of any particular amount are due to UGP because it is unable to calculate the fees that UGP may be owed without the current reporting on Business activities it has unsuccessfully requested. SPL acknowledges, however, that UGP may be entitled to compensation for pre-petition services as set forth in Section 14 of the SPL Agreement, including administrative service and marketing fees typically paid from the Premium Account (Ex. B, Section 12(b)).  On information and belief, UGP has performed no services after the Petition Date that would justify payment of any compensation to UGP; to the contrary, UGP's failure to perform has caused SPL significant financial upheaval and loss.

365(d)(1), a chapter 7 trustee is generally afforded sixty days to determine whether to assume or reject the debtor's executory contracts. As a general matter, the Third Circuit follows the so-called Countryman test for determining whether a contract is executory or non-executory. Under the Countryman test, an executory contract is defined as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Spyglass Media Group, LLC v. Cohen (In re Weinstein Company Holdings, LLC)*, 997 F.3d 497, 504 (3d Cir. 2021) (*quoting* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)). The Third Circuit has stated that "the test for an executory contract is whether, under the relevant state law governing the contract, each side has at least one material unperformed obligation as of the bankruptcy petition date." *Id.* Because the SPL Agreement involves ongoing obligations on the part of both SPL and UGP, SPL does not contest that the SPL Agreement is an executory contract.

2.     While ordinarily the provisions of Section 365(d)(1) may not cause undue hardship to the non-debtor counterparty to an executory contract, where, as here, compliance with the contract requires action by the debtor on a daily basis, the debtor's failure to perform for sixty days (or potentially more, if allowed by the court) would be catastrophic. As previously stated, UGP's failure to perform, including its refusal to allow SPL access to the SPL Data and its wholesale failure to enable SPL's processing of filed claims – of which SPL has not even been informed – has exposed SPL to regulatory censure up to and including fines or a potential loss of its licensure, and to action by policyholders and certificate holders who are being denied the benefits they were promised by SPL (Ex. C at ¶ 21). Additionally, Debtor's retention of funds, including premiums,

that UGP acknowledges are the property of SPL that it holds as a fiduciary[9], jeopardizes SPL's ability to pay valid claims of which it does have knowledge.

3.      Pursuant to section 362(a) of the Bankruptcy Code, SPL is stayed from taking any action to terminate the SPL Agreement, notwithstanding UGP's cessation of business[10] and SPL's clear right to terminate the agreement on that basis.   Yet, the current situation makes abundantly clear why SPL specifically included UGP's cessation of business as grounds for terminating the agreement.   UGP's failure to perform its duties and obligations under the SPL Agreement for any period, but particularly for the extended period already occurring after the Petition Date and presumably continuing[11] until the Trustee appropriately rejects the agreement or allows sixty days to pass without taking action, is wreaking havoc on SPL's operations.   Indeed, UGP's failure to account for premiums, or process claims, or remit funds to SPL, or make required reports to SPL, or even allow SPL access to its own SPL Data to attempt to compile its own reporting or comply with its regulator's requests for information, is catastrophic.   The disruption in administration of the Gap Plans caused by UGP's lack of performance has left SPL exposed to potential enforcement actions that could put SPL's licensure at risk and result in monetary fines and has rendered SPL unable to administer and pay claims as agreed in the Gap Plans, leading to possible litigation.   SPL needs, as a regulated insurer, to comply with all regulatory requirements and laws.   It also needs

---

[9] SPL estimates that as much as $900,000 in monthly premiums would be paid into the Accounts collectively, for both SPL and SPI.   (Ex. C at ¶ 25).   As previously noted, UGP's Schedules and SOFA identified certain UGP-managed Accounts as holding SPL's funds, for the benefit of SPL, pursuant to the SPL Contract.

[10]   SPL is not seeking to terminate the SPL Agreement based on UGP's filing of its petition for relief under chapter 7 or its financial condition, which Section 365(e)(1)(A) and (B) make clear is impermissible. Indeed, UGP's financial condition is unknown an immaterial to SPL. Rather, SPL seeks to terminate based on section 21(b)(i) of the SPL Agreement, which allows SPL to terminate the SPA Agreement upon the "[c]essation of UGP's business."

[11] On information and belief, UGP's workforce has been drastically reduced to as few as ten individuals, and those individuals have not only failed to perform under the agreement, they have provided no indication or assurance that the situation will change in the near term.   Indeed, given the general inability and understandable reluctance of a chapter 7 Trustee to operate a debtor's business, SPL has no reason to expect the situation to improve before it suffers irreparable damage to its own business.

to perform its own duties to policyholders and insured members in compliance with the policies. But, while facing these urgent needs, SPL has had no access to the SPL Data or to its funds, including premiums, that should be used to pay claims promptly. SPL, a regulated entity contractually-obligated to pay health claims submitted by its insured members, has been rendered incapable of complying with its own legal and contractual obligations by UGP's inaction, yet SPL is stayed from enforcing what UGP acknowledged and agreed in the SPL Agreement was a valid ground for termination.

4.      Indeed, UGP's performance under the SPL contract may well be, or have been, rendered impossible if UGP loses, or has already lost, its certificate to operate as a TPA. Applicable Michigan law provides that the director of the department of insurance and financial services may deny, suspend, or revoke the license of a TPA, or may issue a cease and desist order, if the director finds, after notice and opportunity for hearing, that a TPA required to have a license "fails at any time to meet any qualification for which issuance of a license could have been refused …" MCLA 550.952.(3). An applicant for an initial certificate of authority to operate as a TPA must provide "[r]ecent financial statements showing the third party administrator's assets, liabilities, and sources of financial support sufficient in the opinion of the commissioner, upon the advice of the board, ***to show financial viability of the third party administrator***." MCLA 550.912(e) (emphasis added). So, if a TPA fails to show financial viability at any time, it is subject to loss of its certificate, rendering it unable to act as a TPA in Michigan. Given that SPL only issues Gap Plans in Michigan, a loss by UGP of its Michigan certificate would make it unable to administer SPL's Business under the SPL Agreement.

5.      SPL is not arguing that such action by the Michigan licensing authority would, or would not, be exempted from the stay under Section 362(b)(4), but to point out that UGP's ability

to perform seems unlikely both practically and, potentially, legally. Denying SPL the ability to terminate the SPL Agreement and redirect the Business to itself or a capable TPA holding the proper credentials would defy equity. UGP's inability to save itself from insolvency, and the consequences thereof, while unfortunate, is no justification for causing SPL significant financial harm by perpetuating the existence of the SPL Agreement.

6.      Section 362(d)(1) of the Bankruptcy Code allows a party in interest to request relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." Although cause is not defined in the Bankruptcy Code, courts have determined whether cause exists by looking at "the totality of the circumstances in each particular case" (see *Bricker v. Scalera (In re Scalera)*, 521 B.R. 513, 516 (Bankr. W.D. Pa. 2014); *In re Project Orange Assocs., LLC*, 432 B.R. 89, 113 (Bankr. S.D.N.Y. 2010) (discussing bad faith as demonstrating cause)).

7.      As noted above, cause exists for lifting the stay to allow SPL to terminate the SPL Agreement under its own terms due to UGP's cessation of its business activities. A continuation of the SPL Agreement, under which UGP is not performing, and likely cannot perform, unfairly punishes SPL and the policyholders whose policies are not being administered and insured members whose claims are not being paid. SPL is facing serious financial constraints due to its inability to access its funds in the Accounts to pay claims. SPL also risks negative action by its regulators as a result of the unprocessed claims and its inability to provide necessary information to the regulators on demand. Insured members are facing medical costs that should be covered under the Gap Plans but are not being paid, and SPL will bear the brunt of their complaints for not receiving the coverage they were promised. Parties are facing actual, serious and adverse

ME1\57900030.v1

consequences every day that the SPL Agreement remains – at least from a legal standpoint – "active." Surely, SPL has established cause for relief.

8.     Although Section 365(d)(2), allowing a non-debtor counterparty to ask a court to compel a debtor's assumption or rejection of an executory contract, by its terms does not apply in a chapter 7 proceeding, the insight of courts assessing a request under that provision in a chapter 11 proceeding may be useful by analogy in parsing the meaning of "cause" in the context of a party seeking leave to terminate an executory contract pursuant to Section 362(d)(1). Although certain factors cited by courts are relevant only in the context of chapter 11 proceedings, others focus more broadly on the impact to non-debtor counterparties of continued uncertainty regarding an executory contract, including the damage that can occur through delay. In *Adelphia Commc'ns. Corp.*, 291 B.R. 283 (Bankr. S.D.N.Y. 2003), the court listed multiple factors for consideration, including in relevant part here:

(a)     the nature of the interests at stake;

(b)     the balance of the harm to the litigant;

(c)     the good to be achieved;

(d)     the safeguards afforded to the litigants;…

(f)     the debtor's failure or ability to satisfy post-petition obligations;

(g)     the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code; …

*Id*. at 293 (internal citations and quotations omitted). As is clear from the facts above, the nature of the interests at stake is critical. Allowing UGP to continue to hold the contract while failing to perform risks serious financial harm to insured members whose claims are not being paid, and to SPL, which risks financial and legal exposure through its inability to administer and pay claims. Similarly, any balancing of harm, or good, or safety (or the lack thereof) between the parties must

16

weigh in favor SPL and the policyholders and insured members who rely on the coverage SPL agreed to provide. UGP's continued failure and apparent inability to perform is the cause of the harm faced by SPL and the claimants, that harm will continue. And, the reputational and commercial damage threatened by SPL's inability to meet its legal and contractual obligations without access to the SPL Data and its funds being held by UGP is substantial and not something that can be remedied in this chapter 7 proceeding. Only through a termination of the contract and delivery to SPL of, or unfettered access for SPL to, the SPL Data, can SPL verify whether coverages remain in force and begin to normalize the administration of the policies and adjudication of claims under the Gap Plans. And UGP, which is holding SPL's funds as a fiduciary, can meet its fiduciary duties only by delivering such funds, net of any amounts owed to UGP under the SPL Agreement prior to its termination, to SPL to be used for the payment of claims.

9.      Bankruptcy Code Section 362(d)(1) provides that a court "shall grant relief from the stay… such as by terminating, annulling, modifying, or conditioning such stay," for cause or for other grounds. 11 U.S.C. § 362(d). As one respected treatise states, "[t]he flexibility of section 362 is underscored by the language of subsection (d), which provides that relief may be granted by 'terminating, annulling, modifying, or conditioning' the stay. The effect is to permit the court to fashion the relief to the particular circumstances of the case." 3 COLLIER ON BANKR. ¶ 362.07[1] at 362-104 (16th ed. 2010). Moreover, "[t]he use of the word 'annulling' means that relief from the stay may operate retroactively." *Id.* An order annulling the automatic stay treats the stay as if it had never come into existence, with the practical effect that any actions taken during the time the stay was in place were unaffected by the stay and therefore do not result in any consequences for violation of the stay. *See Fjeldsted v. Lien (In re Fjeldsted)*, 293 B.R. 12, 21

(BAP 9th Cir. 2003). Although annulment has at times been viewed an extreme remedy, typically available to creditors who were unaware of the bankruptcy at the time any action was taken, *see In re Chipito, Inc.*, 487 B.R. 80, 84 (Bankr. D. P.R. 2013); *In re WorldCom, Inc.*, 325 B.R. 511, 521-22 (Bankr. S.D.N.Y. 2005), courts have also held that annulment is not an extraordinary remedy when found justified through a balancing of the equities. *See Fjeldsted*, 293 B.R. at 22-23.

10.     In the period leading up to the Petition Date, SPL had growing concerns that UGP would cease operations upon the filing of a bankruptcy petition, particularly given the uncertainty regarding any potential transaction with CarynHealth, an entity that was – at the time at least, although its current status is unknown – unlicensed as a third party administrator ("TPA") and that had grown unresponsive to SPL. (Ex. C at ¶ 9.) Accordingly, SPL had no option but to become operationally ready to shift certain operations in-house as a stop-gap measure if UGP halted its performance under the SPL Agreement. (Ex. C at ¶ 11.) This was the only reliable means by which SPL could ensure it would continue to meet its obligations to its policyholders, insured certificate holders, and its regulators, which have granted SPL licenses to transact insurance business conditioned upon remaining in compliance with the laws and requirements of each state, as well as complying with federal requirements under HIPAA. (Ex. C at ¶ 12.)

11.     After the Petition Date, when SPL's business personnel were unable to obtain the information that SPL needed from UGP regarding the status of claims, including newly-submitted claims, and the payment of premiums, or even obtain access to the SPL Data to extract the information on its own, SPL was rendered incapable of performing under its policies or complying with requests from its regulators, with no assurance that such flow of or access to information would ever be restored. As noted above, the risk to both SPL and its policyholders and insured

members of SPL doing nothing was enormous. Moreover, if SPL lost its license based on its failure to perform as required by applicable law and regulations, the SPL Agreement itself would be rendered meaningless and devoid of any value it could conceivably have for the estate. Accordingly, SPL took steps with its policy and certificate holders to ensure that, going forward, premiums were properly billed and accounted for, to ensure policies remained in force, and that claims were received, processed and paid, all the while recognizing that such actions did nothing to resolve the serious issues presented by claims and premiums caught up in the silence of the UGP bankruptcy. SPL undertook such actions to ensure continuity of service, not to terminate the SPL Agreements with UGP. SPL continues to account for revenues as if UGP were performing its duties, and SPL has never asserted that UGP is not entitled to receive the compensation it may be duly owed under the SPL Agreement. Rather, SPL took protective action to preserve the Business as much as it could until the SPL Agreement could be terminated pursuant to an order of this Court – or alternatively, successfully assumed and assigned to an appropriate entity that could provide the requisite assurance of future performance to which SPL is entitled, although that path seems unlikely at this juncture. SPL would submit that the net impact of its actions on the estate are positive, in that the Business administered under the SPL Agreement as of the Petition Date has not been lost, to this point, due to UGP's nonperformance, but to the extent that any action could be construed as a violation of the stay, SPL respectfully requests that the stay be annulled based on the balancing of equities presented by the circumstances.

B.      **SPL is entitled to its funds in the Accounts and the SPL Data being held by SPL.**

12.      The SPL Data is contractually designated as the property of SPL, and UGP is prohibited from destroying it or transferring it without SPL's written authorization to do so, which

SPL has not provided. (Ex. B, Section 11(d)). Under the SPL Agreement, while it remains in force, SPL is entitled to access, inspect, and copy the SPL Data. (Ex. B, Section 11(c)). And, upon UGP's cessation of business, or if UGP is no longer capable of maintaining the SPL Data, SPL is entitled to take immediate possession of the SPL Data, at SPL's cost. (Ex. B, Section 11(d)). At a minimum, pending any termination of the SPL Agreement, SPL is entitled to – and in fact must have, in order to maintain the Business – access to the SPL Data as agreed under the SPL Agreement. That has not occurred. Upon termination, SPL can obtain and remove the SPL Data.

13.     In the meantime, UGP must preserve, protect and secure the SPL Data, including its confidentiality, and UGP must not transfer or sell the SPL Data – property of SPL, not UGP – to any third party. Under applicable state and federal data privacy and security laws and regulations, SPL is obligated to protect the privacy and security of its customers' data from unauthorized access, use or disclosure, including Protected Health Information (PHI) under federal HIPAA law, and UGP has agreed to uphold those obligations. (See the required Business Associate Agreement executed by UGP (Ex. B, at Exhibit 3)). Since the Petition Date, SPL has no way of knowing whether UGP's systems (including as related to the SPL Data) continue to be monitored actively by UGP from a cybersecurity perspective, but any failure of UGP to do so could expose SPL and its customers to substantial risk and harm given the nature of the data being held, which includes PHI. If UGP is unable to provide such security, SPL should be authorized immediately to remove the SPL Data from UGP's systems.

14.     UGP has acknowledged in its Schedules and SOFA that SPL owns the funds in the Accounts and that UGP holds SPL's funds in the Accounts as a fiduciary. As such, in holding the Accounts UGP has a fiduciary duty not only to act solely in the interest of SPL, its principal, but

also to comply with and adhere to the governing documents. SPL's inability to access its own funds, coupled with UGP's failure to release funds as required under the SPL Agreement, do not satisfy UGP's duties as fiduciary. Even pending termination of the SPL Agreement, SPL is entitled to receive funds from the Accounts in accordance with the SPL Agreement, so that it can, among other matters, pay claims promptly. Upon termination of the SPL Agreement (if not sooner), all funds, net of any compensation duly owed to UGP, must be transferred by UGP immediately at SPL's direction.

C.     **Grounds exist for waiver of the 14-day stay under Rule 4001(a)(3).**

11.     Bankruptcy Rule 4001(a)(3) provides that "[a]n order granting a motion for relief from an automatic stay . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 4001(a)(3). Rule 4001(a)(3) serves at least two purposes. First, the Rule provides a window of time for a party affected by an order granting stay relief to take steps in response to the order, including to request a stay pending appeal before the order is enforced or implemented. *See* FED. R. BANKR. P. 4001 Advisory Committee's Note (1999 Amendment). And second, the Rule permits a court, in its discretion, to order that it is not applicable, so that the prevailing party may proceed immediately. *Id.*

> As the COLLIER's treatise explains:
>
> The rule does not provide the grounds on which a court would do so, but indirectly suggests that a risk of irreparable damage to the creditor would provide such grounds. … [T]he rule implies that the 14-day stay should not apply in circumstances where a delay after the entry of the order could create the same risk of irreparable damage that delay before the entry of the order might create.

3 COLLIER ON BANKR. ¶ 362.08[9] at 362-133 (16th ed. 2010). *See, e.g., In re Taub*, 438 B.R. 39, 51 (Bankr. E.D.N.Y. 2010) (waiving the 14-day stay).

12.     SPL respectfully requests waiver of the 14-day stay.  As set forth above, further delay in SPL's ability to terminate the SPL Agreement so that it can obtain control and possession of the SPL Data, including newly-filed claims, and begin processing and paying claims as it is obligated to do, would damage both SPL and the insureds seeking the coverage from SPL for which they have paid.  The same grounds justifying entry of the Order granting relief support a waiver of the 14-day stay.

**NOTICE**

SPL will provide notice of this Motion to: (a) the U.S. Trustee; (b) Jami Nimeroff, the Chapter 7 Trustee and her counsel; and (c) all parties entitled to notice pursuant to Local Rule 2002-1(b).  SPL submits that no other or further notice is required, and that the Motion should be granted and an order entered without a hearing unless a timely objection is made.

**NO PRIOR REQUEST**

No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, SPL respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as may be just and proper.

Date:   September 16, 2025              **McCARTER & ENGLISH LLP**
        Wilmington, DE

                                        */s/ Kate Roggio Buck*
                                        Kate Roggio Buck (DE #5140)
                                        405 North King Street, 8th Floor
                                        Wilmington, DE 19801
                                        Telephone:  (302) 984-6300
                                        Facsimile:  (302) 984-6399
                                        Email: kbuck@mccarter.com

                                        AND

22

Jayna Lamar, Esq. (admitted *pro hac vice*)
Maynard Nexsen PC
1901 Sixth Ave N., Suite 1700
Birmingham, AL 35203
Telephone: (205) 254-1048
jlamar@maynardnexsen.com

*Attorneys for ShelterPoint Life Insurance Company*

ME1\57900030.v1