**Exhibit A**

September 21, 2025

Jami Nimeroff, Chapter 7 Trustee of
United Group Programs, Inc.
919 N. Market Street, Suite 420
Wilmington, Delaware 19801

Re:    *Asset Purchase Agreement*

Ladies and Gentlemen:

Reference is made to that certain *Trustee's Motion for Order: (A) Approving the Sale of Certain of the Assets of the Estates Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(B) and (F); (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant To 11 U.S.C. § 365; and (C) Granting Related Relief*, filed by the interim Chapter 7 trustee (the "Trustee") for the estates (the "Estates") of (i) United Group Programs, Inc., a Delaware corporation ("UGP"), (ii) UPG Buyer, Inc., a Delaware corporation ("UGP Buyer"), and (iii) UPG Holdings, Inc., a Delaware corporation ("UGP Holdings" and, together with UGP and UGP Buyer, collectively, the "Debtors"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 17, 2025 (as such motion may hereafter be amended by the Trustee and approved by final order of the Bankruptcy Court, the "Sale Motion"), pursuant to which the Trustee seeks Bankruptcy Court authority to sell certain of the Estates' assets relating to the group plan third party administrator (TPA) business conducted by the Debtors under the "OptiMed Health" brand prior to the Debtors' bankruptcy filings on August 15, 2025 (the "Petition Date") (such business, exclusive of the individual plan TPA business also conducted by the Debtors, the "Business") on the principal terms and conditions set forth in that certain letter of intent, dated September 16, 2025 (the "Letter of Intent"), by and between the Trustee and CarynHealth Solutions, LLC, a Delaware limited liability company ("CarynHealth"). In connection with the Sale Motion and the Letter of Intent, CarynHealth Management Services LLC, a Delaware corporation and an affiliate of CarynHealth, or its permitted assignee in accordance with Section 12.1 below (the "Buyer") and the Trustee make and enter into this Asset Purchase Agreement (this "Agreement") for the acquisition of certain assets of the Estates specified herein relating to the ownership, operation and management of the Business, all upon the terms and conditions set forth herein (collectively, the "Acquisition"); provided, however, that in the event of any inconsistencies between this Agreement, on the one hand, and the LOI or the Sale Motion, on the other hand, this Agreement shall control.

1.    **Purchase and Sale of Assets.**

1.1    Purchased Assets.  Subject to the terms and conditions of this Agreement, at Closing (as defined below), the Buyer shall purchase, accept and assume, and the Trustee shall sell, transfer, and convey, all of the Estates' interest in those assets set forth in this Section 1.1 (collectively, the "Purchased Assets"), free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability) pursuant to Sections 105, 363, and 365 of the United States Bankruptcy Code (the "Bankruptcy Code"):

1.1.1    All agency, marketing, and benefits and claims administration agreements and similar contracts entered into by UGP with those insurers identified on Schedule 1.1.1 hereto in connection with the conduct of the Business (collectively, the "Carrier Contracts"), together with all rights thereunder;

1.1.2    All administrative services contracts entered into by UGP with employer group customers for the administration of coverage or benefits provided under the Carrier Contracts

or otherwise in connection with the conduct of the Business (collectively, the "<u>ASO Agreements</u>"), together with all rights thereunder;

1.1.3    All active agency, brokerage and commission agreements entered into by UGP and brokers, general agents and managing general agents in connection with the conduct of the Business under the Carrier Contracts (collectively, the "<u>Broker Contracts</u>"), together with all rights thereunder;

1.1.4    All receivables due to UGP as of the Petition Date, as identified on <u>Schedule 1.1.4(a)</u> hereto, and as have accrued or shall accrue thereafter (including any proceeds collected thereon since the Petition Date, the "<u>TPA Receivables</u>") and the trust, fiduciary and other accounts maintained by or on behalf of UGP and all funds held therein as of September 16, 2025 (the "<u>LOI Date</u>"), as identified on <u>Schedule 1.1.4(b)</u> hereto, and as are received hereafter in respect of collections on the TPA Receivables (the "<u>TPA Accounts</u>"), in each case in connection with the Business conducted under the Carrier Contracts, the ASO Agreements and the Broker Contracts;

1.1.5    The real property leases identified on <u>Schedule 1.1.5</u> hereto, together with all rights thereunder (collectively, the "<u>Leases</u>");

1.1.6    Those other contracts and agreements identified on <u>Schedule 1.1.6</u> hereto that are used in or necessary for the conduct of the Business (such contracts and agreements, together with the Carrier Contracts, the ASO Agreements, the Broker Contracts and the Leases, collectively, the "<u>TPA Contracts</u>"), together with all rights thereunder;

1.1.7    All furniture, fixtures, equipment and other personal property (including all computer hardware, servers, network equipment and other IT systems), including the lessee's interest in property leased under TPA Contracts, related to the Business and located at or on the real property subject to the Leases, including those laptop computers identified on <u>Schedule 1.1.7</u> hereto (collectively, the "<u>TPA FF&E</u>");

1.1.8    All (a) U.S. and foreign trademarks, service marks, trade names, brand names, trade dress, logos, design marks, and business names owned or exclusively licensed by UGP and used in the Business, including the "OptiMed" and "OptiMed Health" marks, (b) U.S. and foreign copyrights and other work of authorships, regardless of the medium or means of expression, including software, websites, content, images, logos, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings and other works of authorship, whether registered or unregistered, owned or exclusively licensed by UGP, in and to the business forms, documents, materials (including marketing materials), processes and procedures used in the Business, (c) owned and exclusively licensed intellectual property rights of UGP in and to the proprietary online quote generation and benefits administration platforms and portals operated by UGP under the "OptiRater" and "OptiAdmin" names, (d) internet domain names, uniform resource locators, and social media accounts and handles associated with the foregoing, (e) registrations, registration applications, and renewals of the foregoing, together with all goodwill associated therewith, (f) phone numbers used in the operation of the Business, and (g) rights of UGP in and to the computer software, databases, and systems operated on or used by the IT systems and laptop computers included among the TPA FF&E (collectively, the "<u>TPA IP Assets</u>");

1.1.9    All business, personnel, financial, tax, legal, and other records, customer lists, vendor lists, telephone listings, advertising copy, photographs, brochures or other literature, or other documents of the Estates related to the conduct of the Business and the ownership, operation, and management of the other Purchased Assets, whether in paper or electronic form, (the "<u>TPA Business Records</u>" and, together with the TPA Receivables, the TPA Accounts, the TPA Contracts, the TPA FF&E, and the TPA IP Assets, collectively, the "<u>TPA Assets</u>"); and

1.1.10 Subject to Buyer's receipt of such regulatory and other consents and approvals as may be required from the Turks & Caicos Islands Financial Services Commission (collectively, the "Regulatory Approvals"), all issued and outstanding shares of capital stock and other direct and indirect equity ownership interests (the "Captive Insurer Equity") in and to United Programs Reinsurance Company, Ltd., a limited liability company organized in the Turks and Caicos Islands (the "Captive Insurer"), held by UGP Buyer as of the Petition Date, including the Estates' indirect and beneficial interest in all cash and reserves of the Captive Insurer as of the LOI Date and as accrue hereafter (the "Captive Reserves"), as well as all contracts and agreements which relate to the ownership or management thereof (the "Captive Insurer Contracts" and, together with the Captive Insurer Equity, collectively, the "Captive Insurer Assets"), together with all rights thereunder.

Notwithstanding anything to the contrary herein: (a) the Trustee shall be permitted to retain copies of, and shall be afforded reasonable access (at the Estates' sole cost and expense) during normal business hours and upon reasonable advance notice to, the TPA Business Records from and after the Closing to the extent necessary for the efficient administration of the Estates following the Closing; provided, however, that the Trustee shall use such copies solely for such administrative purposes, shall not sell, transfer, convey, or assign any of such copies to any third party, and shall promptly destroy or return such copies to the Buyer upon the final liquidation of the Estates; and (b) Buyer and the Trustee agree that (i) the transfer of the TPA Business Records is not intended to operate as and shall not be deemed to be a waiver of the attorney-client privilege by the Estates or the Trustee, (ii) from and after the Closing, until such time as the Estates are no longer subject to the jurisdiction of the Bankruptcy Court, such attorney–client privilege shall belong to and may be controlled by the Trustee (for itself and on behalf of the Estates), and (iii) in the event that a dispute arises between the Buyer and/or the Business and a third party after the Closing, the Buyer may assert such attorney–client privilege on behalf of the Trustee and the Estates to prevent disclosure of communications privileged thereby to such third party.

1.2     Removal of Certain Contracts.  Notwithstanding anything to the contrary in Section 1.1, the Buyer may, with respect to any TPA Contract or Captive Insurer Contract, elect to have the same removed from the Purchased Assets by written notice (a "Contract Election Notice") to the Trustee at any time prior to the later of (a) the Closing, or (b) the third (3rd) business day following the date on which the Cure Amount in respect of such TPA Contract or Captive Insurer Contract is finally determined by order of the Bankruptcy Court. Any TPA Contract or Captive Insurer Contract so removed from the Purchased Assets shall not be sold, transferred, or conveyed by the Trustee, shall not be purchased, accepted or assumed by the Buyer, and shall instead be deemed to remain with the Estate from and after the Closing.

1.3     Assumed Liabilities.  Subject to the terms and conditions of this Agreement, at Closing, the Buyer shall assume and be liable for, and shall pay, honor and discharge when due, only the following liabilities of the Estates (collectively, the "Assumed Liabilities"):

1.3.1     All executory obligations of the Business arising from and after the Closing under the TPA Contracts and Captive Insurer Contracts included in the Purchased Assets and not removed therefrom via a Contract Election Notice (collectively, the "Designated Contracts"); and

1.3.2     All liabilities and obligations arising from or relating to the ownership, operation and management of the Purchased Assets from and after the Closing, including those trust and fiduciary obligations in favor of insurers, insureds, and brokers expressly arising under the Carrier Contracts in respect of the funds held in the TPA Accounts as of the Closing.

1.4     Excluded Assets & Liabilities.

1.4.1    Notwithstanding any other provisions of this Agreement, the Estates shall retain, and the Purchased Assets shall not include, and the Trustee shall not sell, convey, assign, transfer or deliver to the Buyer, any of the Estates' assets, properties or rights of any kind or nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereinafter acquired, that are not Purchased Assets, including, but not limited to: (a) any TPA Contracts or Captive Insurer Contracts that are not Designated Contracts and (b) data relating to the PIC MEC and the Gerber MEC that is maintained or stored on the VBA program (collectively, the "Excluded Assets").

1.4.2    Notwithstanding any other provisions of this Agreement, the Buyer shall not assume and shall not be responsible to pay, perform or discharge any liabilities of the Estates or any affiliates thereof of any kind or nature, other than the Assumed Liabilities, including any liabilities or obligations (other than the Cure Amounts) arising from or relating to the ownership, operation and management of the Purchased Assets or the Business prior to the Closing (collectively, the "Excluded Liabilities").

1.5    Cure Amounts.

1.5.1    The amounts necessary, pursuant to Section 365 of the Bankruptcy Code, to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under any Designated Contract (the "Cure Amounts") shall be paid by the Buyer as and when determined by the Bankruptcy Court in the Sale Order (as defined below); provided, however, that the Buyer shall have standing to object to the Bankruptcy Court's determination of any such Cure Amounts. The Buyer will not pay cure costs for any Excluded Asset.

1.5.2    From and after the date hereof until Closing, except as otherwise provided for herein, the Trustee shall not assume (or pay any cure amounts in connection therewith) or reject or seek to assume or reject any TPA Contract or Captive Insurer Contract without the prior written approval of the Buyer. Notwithstanding the foregoing, nothing herein shall in any way restrict the Trustee's ability to reject, terminate, amend, modify or assign (including assumption and assignment and sale to a third party purchaser) any TPA Contract or Captive Insurer Contract following the Trustee's receipt of a Contract Election Notice in respect thereof.

2.    **Definitive Transfer Agreements; Further Conveyances and Assumptions.**

2.1    Definitive Transfer Agreements. At Closing, (a) the assignment and assumption of the Designated Contracts (other than the Leases), the TPA Receivables, the TPA Accounts, and the TPA Business Records shall be consummated pursuant to an Agreement of Assumption and Assignment, substantially in the form attached hereto as **Exhibit A** (an "Assumption and Assignment Agreement"), (b) the assignment and assumption of the Leases included among the Designated Contracts shall be consummated pursuant to an Assumption and Assignment of Lease, substantially in the form attached hereto as **Exhibit B** (an "Assignment of Lease"), (c) the purchase and sale of the TPA FF&E shall be consummated pursuant to a Bill of Sale, substantially in the form attached hereto as **Exhibit C** (a "Bill of Sale"), (d) the assignment and assumption of the TPA IP Assets shall be consummated pursuant to an Assignment of Intellectual Property, substantially in the form attached hereto as **Exhibit D** (an "IP Assignment"), and (e) the assignment and assumption of the Captive Insurer Equity shall be consummated pursuant to a Stock Power and Assignment, substantially in the form attached hereto as **Exhibit E** (a "Stock Power and Assignment"). The Trustee and the Buyer or its designated affiliate shall execute the Assumption and Assignment Agreement, the Assignment of Lease, the Bill of Sale, the IP Assignment, and the Stock Power and Assignment (collectively, the "Definitive Transfer Agreements") and deliver the same to one another at the Closing.

2.2     Further Conveyances and Assumptions. At Closing, and from time to time thereafter, the Trustee and the Buyer shall, and shall cause their respective affiliates to, execute, acknowledge and deliver all such additional instruments and documents, and take such further ministerial and administrative actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to the Buyer and its respective successors or permitted assigns, all of the Estates' right, title and interest of any kind or nature in and to the Purchased Assets and to assure fully to the Trustee and the Estates, the assumption and acceptance of Assumed Liabilities, and to otherwise make effective or evidence the Acquisition; *provided, however*, that Buyer shall pay all of the Trustee's reasonable costs and expenses (including reasonable attorneys' fees) in excess of Ten Thousand Dollars ($10,000) in the aggregate incurred in connection with actions taken at Buyer's request under this Section 2.2 in the first four (4) months after Closing, and one hundred percent (100%) of the Trustee's reasonable costs and expenses (including reasonable attorneys' fees) incurred in connection with actions taken at Buyer's request under this Section 2.2 thereafter, in each case promptly following receipt of supporting documentation reasonably requested by the Buyer.

3.     **Consideration.**

3.1     Aggregate Consideration.

3.1.1     The aggregate consideration for the purchase and sale of the Purchased Assets shall consist of the following:

(a)     One Million Two Hundred Ninety Thousand Dollars ($1,290,000) by wire transfer of immediately available funds (the "Cash Consideration"), which shall be due and payable by the Buyer at Closing and deliverable to the Estates in accordance with Section 4; provided, however, that, in the event of multiple Closings, the portion of the Cash Consideration that is due and payable to the Estates at (i) the Initial Closing (as defined below) in respect of the TPA Assets only shall be an amount equal to Seven Hundred Ninety Thousand Dollars ($790,000) (such portion of the Cash Consideration, the "TPA Cash Consideration"), and (ii) the Subsequent Closing (as defined below) in respect of the Captive Insurer Assets only shall be an amount equal to Five Hundred Thousand Dollars ($500,000) (such portion of the Cash Consideration, the "Captive Cash Consideration");

(b)     Payment of the Cure Amounts by the Buyer as and when determined by the Bankruptcy Court in the Sale Order; and

(c)     Assumption of the Assumed Liabilities by the Buyer.

4.     **Closing.**

4.1     Closing. Subject to the terms and conditions set forth herein and in the Definitive Transfer Agreements, the consummation of the transactions contemplated hereby and thereby, including the Acquisition (the "Closing") shall take place remotely via an exchange of consideration and documents using overnight courier service, wire transfers, electronic mail or facsimile transmission, at 10:00 a.m., local Atlanta, Georgia time, on the earliest date practicable (but not more than three (3) business days) following the date on which all of the conditions precedent specified in Section 5 hereof have either been satisfied or waived (other than those conditions that by their nature are capable of being fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions), or at such other time and place as the Trustee and the Buyer may agree (the "Closing Date"). All actions taken at the Closing shall be deemed to be performed simultaneously, and except as otherwise expressly stated herein, the Closing shall not have deemed to have occurred until all required actions of the parties to this Agreement at the Closing have been performed (or the performance thereof waived by the party for the benefit of

which such action is required to be performed). The Closing shall be effective as of 12:01 a.m., local Atlanta, Georgia time on the Closing Date.

4.2     Notwithstanding the foregoing, if all of the TPA Closing Conditions (as defined below) have either been satisfied or waived (other than those conditions that by their nature are capable of being fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions) in respect of the TPA Assets, but the Captive Closing Conditions (as defined below) then remain unsatisfied and have not been waived in respect of the Captive Insurer Assets, the Buyer may elect by written notice to the Trustee (the "Initial Closing Notice") to close the purchase and sale of the TPA Assets only (the "Initial Closing"), which Initial Closing Notice shall set forth a scheduled date for the Initial Closing (the "Initial Scheduled Closing Date") that is not more than three (3) business days after delivery of the Initial Closing Notice. Thereafter, the Trustee and the Buyer shall proceed to conduct the Initial Closing in respect of the TPA Assets only at 10:00 a.m., local Atlanta, Georgia time, on the Initial Scheduled Closing Date or at such other time and place as the Trustee and the Buyer may agree (the "Initial Closing Date"), via an exchange of consideration and documents using overnight courier service, wire transfers, electronic mail or facsimile transmission. The cash consideration due from the Buyer to the Trustee in respect of the TPA Assets at the Initial Closing shall consist exclusively of the TPA Cash Consideration. The Initial Closing shall be effective as of 12:01 a.m., local Atlanta, Georgia time on the Initial Closing Date.

4.3     If, following the consummation of the Initial Closing, all of the Captive Closing Conditions have either been satisfied or waived (other than those conditions that by their nature are capable of being fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions) in respect of the Captive Insurer Assets, the closing of the purchase and sale of the Captive Insurer Assets (the "Subsequent Closing") shall occur on the earliest date practicable (but not more than three (3) business days) following the date on which all of the Captive Closing Conditions have either been satisfied or waived (other than those conditions that by their nature are capable of being fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions), or at such other time and place as the Trustee and the Buyer may agree (the "Subsequent Closing Date"), via an exchange of consideration and documents using overnight courier service, wire transfers, electronic mail or facsimile transmission. The cash consideration due from the Buyer to the Trustee in respect of the Captive Insurer Assets at the Subsequent Closing shall consist exclusively of the Captive Cash Consideration. The Subsequent Closing shall be effective as of 12:01 a.m., local Atlanta, Georgia time on the Subsequent Closing Date.

4.4     For the avoidance of doubt, if there is more than one Closing pursuant to the provisions of this Section 4, where applicable in the context, "Closing" shall mean the closing of the purchase and sale of the applicable Purchased Assets and the other transactions contemplated hereby relating thereto and the "Closing Date" shall mean the date on which such Closing became effective.

4.5     The Trustee's Deliveries. At the Closing, the Trustee shall deliver or cause to be delivered to the Buyer, (a) all documents required to be delivered by the Trustee at Closing under the Definitive Transfer Agreements in respect of the Purchased Assets subject to such Closing, together with all other necessary instruments of assignment, conveyance and transfer of such Purchased Assets, in form and substance reasonably acceptable to the Buyer, and (b) such other documents, instruments and certificates as the Buyer may reasonably request to convey good title to such Purchased Assets to the Buyer, in each case in accordance with the terms and conditions hereof and of the Definitive Transfer Agreements.

4.6     The Buyer's Deliveries. At the Closing, the Buyer shall deliver or cause to be delivered to the Trustee, (a) the Cash Consideration (or applicable portion thereof in respect of the Purchased Assets subject to such Closing), (b) all documents required to be delivered by the Buyer

at Closing under the Definitive Transfer Agreements in respect of the Purchased Assets subject to such Closing, and (c) such other documents, instruments and certificates as the Trustee may reasonably request to transfer, assign and delegate all of the liabilities and obligations of the Estates arising out of such Purchased Assets, in each case in accordance with the terms and conditions hereof and of the applicable Definitive Transfer Agreements.

5.      **Conditions to Closing.**

5.1      Buyer's General Closing Conditions.  In addition to any other conditions to the Buyer's obligation to close set forth in this Agreement, the Buyer's general obligation to consummate the transactions contemplated by this Agreement, including the Acquisition in respect of any Purchased Asset, is subject to the fulfillment, at or before the Closing Date, of the following conditions (the "General Closing Conditions"), any one or more of which may be waived by the Buyer in its sole discretion:

5.1.1      All of the Trustee's representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by the Trustee on and as of such date;

5.1.2      All documents, instruments and assurances required hereunder to be delivered by the Trustee to the Buyer on or prior to the Closing Date shall have been duly delivered to the Buyer in form and substance reasonably satisfactory to Buyer;

5.1.3      All covenants and agreements of the Trustee under this Agreement required to be performed by it on or before the Closing Date shall have been duly performed and satisfied in all material respects; and

5.1.4      The Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Buyer (the "Sale Order") (a) approving this Agreement (including the Expense Reimbursement), as well as the Acquisition and the conveyance of the Purchased Assets (including all of the Carrier Contracts) to the Buyer at the Closing, free and clear of all claims, encumbrances and interests, including any successor liability in accordance with the terms hereof, (b) providing that all valid, enforceable and unavoidable liens otherwise affecting the Purchased Assets shall instead attach at Closing to the Cash Consideration with the same validity, force and effect as the same had with respect to the Purchased Assets, subject to any and all defenses, claims and/or counterclaims or setoffs the Estates may then possess, (c) waiving the stay under Rule 6004(h) and Rule 6006(d) of the Federal Rules of Bankruptcy Procedure, and (d) containing all necessary findings under 11 U.S.C. § 363(m).

5.2      Buyer's TPA Closing Conditions.  In addition to any other conditions to the Buyer's obligation to close set forth in this Agreement, the Buyer's obligation to consummate the Acquisition solely in respect of the TPA Assets, is subject to the fulfillment, at or before the Closing Date, of the following conditions (the "TPA Closing Conditions"), any one or more of which may be waived by the Buyer in its sole discretion:

5.2.1      The absence of any material (i.e., greater than 10%) reduction in the TPA Account balances or the TPA Receivables from and after the LOI Date, except through collections on account of TPA Receivables which are deposited in the TPA Accounts;

5.2.2      The Trustee or its noticing agent shall have delivered adequate notice of the Sale Motion and a copy of the Sale Order to those persons that have an approval, review, consent or other right or option relating to the assignment of any Designated Contract, along with any other necessary or required disclosures under the Bankruptcy Code;

5.2.3    The Cure Amounts payable by Buyer in respect of those TPA Contracts designated on <u>Schedule 5.2.3</u> hereto shall have been determined by the Bankruptcy Court in the Sale Order, in an aggregate amount not to exceed Six Hundred Fifty Thousand Dollars ($650,000); and

5.2.4    The fulfillment or waiver of the General Closing Conditions.

5.3    <u>Buyer's Captive Closing Conditions</u>.  In addition to any other conditions to the Buyer's obligation to close set forth in this Agreement, the Buyer's obligation to consummate the Acquisition solely in respect of the Captive Insurer Assets, is subject to the fulfillment, at or before the Closing Date, of the following conditions (the "<u>Captive Closing Conditions</u>"), any one or more of which may be waived by the Buyer in its sole discretion:

5.3.1    The operation and management of the Captive Insurer since the Petition Date in the ordinary course of business consistent with past practice, except to the extent resulting from UGP's Chapter 7 filing;

5.3.2    The absence of any material adverse effect on the Captive Insurer (including any change in its capital structure since the Petition Date);

5.3.3    The absence of any material reduction in the Captive Reserves from and after the LOI Date;

5.3.4    The receipt by Buyer or its designated affiliate of the Regulatory Approvals;

5.3.5    The fulfillment or waiver of the General Closing Conditions; and

5.3.6    The prior or concurrent Closing of the Acquisition in respect of the TPA Assets.

5.4    <u>Trustee's Closing Conditions</u>.  In addition to any other conditions to the Trustee's obligation to close set forth in this Agreement, the Trustee's obligation to consummate the transactions contemplated by this Agreement, including the Acquisition, is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which may be waived by the Trustee in her sole discretion:

5.4.1    All documents, instruments and assurances required hereunder to be delivered by the Buyer to the Trustee on or prior to the Closing Date shall have been duly delivered to the Trustee in form and substance reasonably satisfactory to the Trustee;

5.4.2    All of the Buyer's representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if again made by the Buyer on and as of such date;

5.4.3    All covenants and agreements of the Buyer under this Agreement required to be performed by it on or before the Closing Date shall have been duly performed and satisfied in all material respects; and

5.4.4    The Bankruptcy Court shall have entered the Sale Order.

6.      Representations and Warranties of the Trustee. The Trustee represents and warrants to the Buyer as follows:

        6.1.1      Title to Purchased Assets. Subject to the entry of the Sale Order, as of the Closing, the Purchased Assets shall be delivered free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability) pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, other than for the trust and fiduciary obligations in favor of insurers, insureds, and brokers expressly arising under the Carrier Contracts in respect of the funds held in the TPA Accounts as of the Closing.

        **6.1.2      DISCLAIMER OF REPRESENTATIONS AND WARRANTIES. EXCEPT AS SET FORTH IN THE SALE ORDER OR AS EXPRESSLY SET FORTH IN THIS <u>SECTION 6</u> AND IN <u>SECTION 12.5</u>, THE PURCHASED ASSETS ARE BEING SOLD "AS IS" AND "WHERE IS" AND THE TRUSTEE MAKES NO, AND HEREBY DISCLAIMS ANY, REPRESENTATION OR WARRANTY WITH RESPECT TO THE PURCHASED ASSETS OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>SECTION 6</u> AND IN <u>SECTION 12.5</u>, THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO:**

        **(A)      THE IDENTITY, SCOPE, EXISTENCE, LOCATION, OR CONDITION OF ANY ASSETS THAT MIGHT BE INCLUDED WITHIN THE SCOPE OF THE PURCHASED ASSETS, WHETHER OR NOT ANY PARTICULAR ASSET IS IDENTIFIED IN THIS AGREEMENT (INCLUDING IN ANY EXHIBIT ATTACHED HERETO);**

        **(B)      THE VALIDITY OR ENFORCEABILITY OF ANY INTELLECTUAL PROPERTY RIGHTS THAT MIGHT BE INCLUDED WITHIN THE SCOPE OF THE PURCHASED ASSETS; OR**

        **(D)      THE APPLICABILITY OF OR COMPLIANCE WITH ANY LAWS OR REGULATIONS THAT MAY BE APPLICABLE TO ANY TRANSACTIONS CONTEMPLATED HEREIN.**

7.      **Covenants of the Parties**.

        7.1      Commercially Reasonable Efforts; Consents.

        7.1.1      The Buyer shall make all commercially reasonable efforts to obtain, and the Trustee shall cooperate in good faith with the Buyer in obtaining, the Regulatory Approvals as promptly as practicable following the date hereof.

        7.1.2      The Trustee shall make all commercially reasonable efforts to obtain, and the Buyer shall cooperate in good faith with the Trustee in obtaining, (a) all required consents from counterparties to the Designated Contracts, to the assignment to the Buyer of the same, or (b) an order of the Bankruptcy Court to the effect that such consents shall not be required for the assignment to the Buyer of the Designated Contracts. If requested by Buyer, the Trustee shall further make all commercially reasonable efforts to oppose the lifting of any stay order of the Bankruptcy Court in respect of any Designated Contract.

        7.1.3      The Trustee and the Buyer shall each cooperate with one another in good faith and use all commercially reasonable efforts to (a) obtain all other third party consents and

approvals required to be obtained to effect the transactions contemplated by this Agreement and the Definitive Transfer Agreements, including the Acquisition, and (b) take, or cause to be taken, all other actions, and to do, or cause to be done, all other things necessary or proper, consistent with applicable law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Definitive Transfer Agreements, including the Acquisition.

7.2     Due Diligence.  From the date upon which this Agreement is fully executed and continuing until the Closing Date or earlier termination of this Agreement, but subject to execution of such confidentiality and non-disclosure agreements as the Trustee may require, in customary form and content reasonably acceptable to Buyer, the Trustee shall afford to the Buyer and its representatives reasonable access to the business, personnel, financial, tax, legal, and other records and information relating to the Business and the Purchased Assets, to the extent within the Trustee's possession or control and as requested by the Buyer or its representatives in connection with their evaluation of the Acquisition; *provided, however,* that, subject to Section 1.1 hereof in respect of the TPA Business Records, the production of any due diligence materials is not intended to operate as and shall not be deemed to be a waiver of the attorney-client privilege by the Estates or the Trustee and, prior to the closing of the Debtors' bankruptcy cases, such attorney–client privilege shall belong to and may be controlled by the Trustee (for itself and on behalf of the Estates).

8.     **Other Agreements.**

8.1     Alternative Transactions; Expense Reimbursement.

8.1.1     Notwithstanding anything herein or in the Definitive Transfer Agreements to the contrary, the Trustee may at any time prior to the entry of the Sale Order furnish information concerning the Purchased Assets to any person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction. Notwithstanding the foregoing, the Acquisition reflected in this Agreement shall be treated as a package deal and should the Trustee consummate any Alternative Transaction without the Buyer's consent, this Agreement shall be considered terminated, the Buyer shall be entitled to the Expense Reimbursement (as defined below) to the extent set forth herein, and the Trustee shall seek entry of an order by the Bankruptcy Court that includes approval of the Expense Reimbursement on the terms set forth herein.

8.1.2     As consideration for and as a material inducement to the Buyer conducting its due diligence and entering into this Agreement, provided that the Buyer is not in default under this Agreement, the Buyer shall be entitled to receive the Expense Reimbursement in the event this Agreement is terminated pursuant to Section 10.1.4.

8.2     Bankruptcy Court Approval.  The Trustee and the Buyer shall use commercially reasonable efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order on or before September 30, 2025, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Buyer under this Agreement. In the event that any orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such order), the Trustee and the Buyer will cooperate in taking such steps to diligently defend against such appeal, petition or motion and the Trustee and the Buyer shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

9.    **Taxes.**

9.1    <u>Taxes Related to the Purchase of the Purchased Assets</u>. Except to the extent otherwise provided for in the Definitive Transfer Agreements, all recording and filing fees and all foreign, federal, state and local sales, transfer, excise, value-added or other similar taxes, including, without limitation, all state and local taxes in connection with the transfer of the Purchased Assets, but excluding all income taxes and other fees based upon gain realized by the Estates as a result of the sale of the Purchased Assets (collectively, "<u>Transaction Taxes</u>"), that may be imposed by reason of the sale, transfer and assignment of Purchased Assets, and which are not exempt under Section 1146(c) of the Bankruptcy Code, shall be paid by the Buyer. The Buyer and the Trustee agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement and the Definitive Transfer Agreement, and the Trustee agrees to assist the Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

9.2    <u>Cooperation on Tax Matters.</u>

9.2.1    The Buyer and the Trustee agree to use reasonable efforts to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any tax return, claim for refund or other required or optional filings relating to tax matters, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer to any governmental or regulatory inquiry relating to tax matters.

9.2.2    The Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and tax records and information relating to the Purchased Assets that are in existence on the Closing Date and transferred to the Buyer hereunder for a period of at least three (3) years from the Closing Date, and will give the Trustee notice and an opportunity to retain any such records in the event that the Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, the Buyer agrees that it will provide access to the Trustee and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Purchased Assets as may be reasonably necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such tax return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 7 of the Bankruptcy Code of the Estates.

9.3    <u>Allocation of Purchase Price and Purchase Price Allocation Forms</u>. The Buyer and the Trustee agree to allocate the Purchase Price among the Purchased Assets pursuant to a tax allocation that is reasonably acceptable to the Buyer and the Trustee and which is to be delivered by Buyer to the Trustee within sixty (60) days following the Closing. The Buyer and the Trustee agree that: (A) neither party shall take a position on any tax return, before any governmental body or in any judicial proceeding that is inconsistent with the Allocation without the written consent of the other party or unless specifically required pursuant to a legally-binding determination by an applicable governmental body, (B) the parties shall cooperate with each other in connection with the preparation, execution and timely filing of all tax returns related to the Allocation, and (C) the parties shall promptly advise each other regarding the existence of any tax audit, controversy or litigation related to the Allocation.

10.    **Termination.**

10.1    <u>Conditions of Termination</u>. At any time before the Closing, this Agreement may be terminated:

10.1.1   By mutual written consent of the Trustee and the Buyer;

10.1.2   By the Trustee, by written notice to the Buyer,

(a)      if the Trustee has previously provided the Buyer with written notice of the Buyer's failure to perform any material covenant of the Buyer contained in this Agreement or any of the Definitive Transfer Agreements, and the Buyer has failed within five (5) business days after such notice to remedy such breach or perform such covenant;

(b)      after October 15, 2025 (the "Approval Termination Date"), if the Sale Order has not been obtained by such date; or

(c)      after the four (4) month anniversary of the Initial Closing if the Regulatory Approvals have not been obtained by such date, *provided* that such termination shall only operate to terminate this Agreement as it relates to the sale of the Captive Insurer Assets;

provided, however, that the Trustee shall not have the right to terminate this Agreement under this Section 10.1.2 if the Trustee is then in material breach of this Agreement;

10.1.3   By the Buyer, by written notice to the Trustee,

(a)      if the Buyer has previously provided the Trustee with written notice of (i) the Trustee's material breach of any of the terms of this Agreement or the Definitive Transfer Agreements, or (ii) the Trustee's failure to perform any material covenant of the Trustee contained in this Agreement or any of the Definitive Transfer Agreements, and the Trustee has failed within five (5) business days after such notice to remedy such breach or perform such covenant;

(b)      after the Approval Termination Date if the Sale Order has not been obtained by such date;

(c)      if the Initial Closing has not occurred on or before the third (3rd) business day following the Approval Termination Date; or

(d)      after the four (4) month anniversary of the Initial Closing if the Regulatory Approvals have not been obtained by such date, *provided* that such termination shall only operate to terminate this Agreement as it relates to the sale of the Captive Insurer Assets;

provided, however, that the Buyer shall not have the right to terminate this Agreement under this Section 10.1.3 if the Buyer is then in material breach of this Agreement; or

10.1.4   Automatically, upon the consummation by the Trustee of any alternative transaction, or series of alternative transactions, with one or more third party purchasers involving the sale and/or assignment of all or any material portion of the Purchased Assets to such third party purchaser(s) (an "Alternative Transaction") without the Buyer's consent to such Alternative Transaction; provided, however, that notwithstanding the foregoing, the Trustee's consummation of the sale and/or assignment to any third party purchaser of any TPA Contract or Captive Insurer Contract following the Trustee's receipt of a Contract Election Notice in respect thereof shall not constitute an Alternative Transaction, shall not automatically terminate this Agreement, and shall not trigger the payment of the Expense Reimbursement.

10.2     Effect of Termination; Remedies.

10.2.1   In the event of termination pursuant to Section 10.1, this Agreement and each of the Definitive Transfer Agreements (if such have been executed prior to such termination)

12

shall become null and void and have no effect (other than Section 10 and Section 12 of this Agreement, which shall survive termination), with no liability on the part of the Trustee or the Buyer, or their respective affiliates, with respect to this Agreement or any of the Definitive Transfer Agreements, except for (a) the liability of a party for its own expenses pursuant to Section 12.4, and (b) any liability provided for in Section 10.2.2 in respect of the Expense Reimbursement.

10.2.2   If this Agreement is terminated pursuant to Section 10.1.4, provided that the Buyer is not then in default under this Agreement, then the Buyer shall be entitled, as its sole and exclusive remedy, to reimbursement from the Estates of one hundred percent (100%) of its out-of-pocket costs and expenses incurred in pursuit of the Acquisition, not to exceed an aggregate amount equal to Seventy Five Thousand Dollars ($75,000), in each case due and payable to the Buyer on the first business day following the date upon which the Trustee consummates the Alternative Transaction(s) giving rise to such termination.

11.   **Certain Covenants Concerning the Designated Contracts.**

11.1   Except as otherwise expressly authorized by the terms of this Agreement (including, without limitation, the pursuit, negotiation, entry into and/or consummation of any one or more Alternative Transactions in accordance with Section 8.1.1), or as required pursuant to an order of the Bankruptcy Court, at all times between the date of execution of this Agreement and the Closing, the Trustee shall not do or agree to any of the following without first obtaining the Buyer's prior written consent, which consent may be withheld in the Buyer's sole and absolute discretion: (i) terminate, amend, modify or assign any Designated Contract; or (ii) sell, lease, encumber or grant any interest in the Purchased Assets or any part thereof in any form or manner whatsoever, or otherwise agree to or enter into any agreement affecting the Purchased Assets which will materially diminish or otherwise materially and adversely affect the Buyer's interest in or to the Purchased Assets subsequent to the Closing Date or which will otherwise materially and adversely affect the Purchased Assets after the Closing (including, without limitation, any material use restrictions that would be binding upon the Buyer or the Purchased after the Closing), other than as to any TPA Contract or Captive Insurer Contract following the Trustee's receipt of a Contract Election Notice in respect thereof.

12.   **Miscellaneous.**

12.1   Successors and Assigns. No party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided, however, that the Buyer may, upon written notice to the Trustee, assign its rights and obligations under this Agreement in whole or in part to one or more direct or indirect subsidiaries or other designees of CarynHealth, it being understood that any such assignment shall not relieve the Buyer of its primary obligations hereunder or, from and after the Closing, under any Designated Contracts accepted and assumed pursuant hereto by the Buyer or such assignee; and, provided, further, that the Trustee may, upon written notice to the Buyer, assign its rights and obligations under this Agreement to any other trustee appointed by the Bankruptcy Court. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

12.2   Governing Law; Jurisdiction. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code. For so long as the Estates are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After the Estates are no longer subject to the

jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the State of Delaware.

12.3    WAIVER OF JURY TRIAL. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OF THE DEFINITIVE TRANSFER AGREEMENTS AND ANY OF THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (C) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.3.

12.4    Expenses. Except as otherwise provided herein, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

12.5    Broker's and Finder's Fees. Each of the parties represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement, and, insofar as such party knows, no other broker or other person is entitled to any commission or finder's fee in connection with any of the transactions contemplated hereby.

12.6    Severability. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

12.7    Notices

12.7.1  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the date of service, if served personally on the party to whom notice is to be given; (b) on the date of delivery or refusal, as confirmed by Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; (c) on the date of delivery or refusal as evidenced by return receipt, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, return receipt requested, postage prepaid and properly addressed, or (d) on the date sent by e-mail of a PDF document (with non-automated confirmation of receipt) if sent at or prior to 5:00 p.m. local time of the recipient, and on the next business day if sent after 5:00 p.m. local time of the recipient (in each case except in the event of any "bounceback" or similar non-transmittal message), to the party as follows:

If to the Trustee:

> Jami Nimeroff
> Chapter 7 Trustee of United Group Programs, Inc.
> 919 N. Market Street, Suite 420
> Wilmington, Delaware 19801
> Email: jnimeroff@brownnimeroff.com

With a copy to (which copy alone shall not constitute notice):

> Cozen O'Connor
> 1201 North Market Street, Suite 1001
> Wilmington, Delaware 19801
> Attention: Mark E. Felger, Esq.
> Email: mfelger@cozen.com

If to the Buyer:

> c/o CarynHealth Solutions, LLC
> 3700 Mansell Road, Suite 250
> Alpharetta, Georgia 30022
> Attention: Jason Pak, Chief Financial Officer; Richard T. Hirsch, Esq., General Counsel
> Email: jason.pak@carynhealth.com; rthlaw@hotmail.com

With a copy to (which copy alone shall not constitute notice):

> Arnall Golden Gregory LLP
> 171 17th Street, Suite 2100
> Atlanta, Georgia 30363
> Attention:Darryl S. Laddin, Esq.; Andrew Hamilton Ellis, Esq.
> Email: darryl.laddin@agg.com; andrew.ellis@agg.com

Any party may change its address for the purpose of this <u>Section 12.7</u> by giving the other party written notice of its new address in the manner set forth above.

      12.8    <u>Amendments; Waivers</u>. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

      12.9    <u>Specific Performance</u>. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms. It is accordingly agreed that the parties shall be entitled to specific performance of the terms hereof, this being in addition to any other remedies to which they are entitled at law or equity.

      12.10    <u>Time of Essence</u>. Time is of the essence in the performance of each and every term of this Agreement.

12.11 _Entire Agreement_. This Agreement and the Definitive Transfer Agreements contain the entire understanding between the parties hereto with respect to the transactions contemplated hereby and supersede and replace the LOI and all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All exhibits or schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

12.12 _Parties in Interest_. Except as otherwise expressly provided in this Agreement, nothing herein is intended to or shall confer any rights or remedies under or by reason of this Agreement on any persons other than the Trustee and the Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third persons to the Trustee or the Buyer. This Agreement is not intended to nor shall it give any third persons any right of subrogation or action over or against the Trustee or the Buyer.

12.13 _Headings_. The section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.14 _Counterparts and Facsimile_. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. The facsimile or other electronic transmission of any original signed counterpart of this Agreement, and the retransmission of any signed facsimile or other electronic transmission, shall be treated for all purposes as the delivery of an original signed counterpart.

[_Signature Page Follows_]

Please confirm your acceptance of the foregoing by signing the enclosed copy of this Agreement in the space provided below and returning the copy to the undersigned.

Very truly yours,

**CarynHealth Management Services LLC**

By:     CarynHealth Solutions, LLC, as its manager

By:_____
Name:
Title:

ACCEPTED AND AGREED
AS OF SEPTEMBER 21, 2025:

**Jami Nimeroff, as Interim Chapter 7 Trustee of**
**United Group Programs, Inc., and its Affiliated Debtors**

_____

Copies to:

Mark E. Felger, Esq.; Cozen O'Connor
Darryl S. Laddin, Esq., and Andrew Hamilton Ellis, Esq.; Arnall Golden Gregory LLP

Please confirm your acceptance of the foregoing by signing the enclosed copy of this Agreement in the space provided below and returning the copy to the undersigned.

Very truly yours,

**CarynHealth Management Services LLC**

By:       CarynHealth Solutions, LLC, as its manager

By: _____
Name: Mike Dendy
Title: Chief Executive Officer

ACCEPTED AND AGREED
AS OF SEPTEMBER ___, 2025:

**Jami Nimeroff, as Chapter 7 Trustee of
United Group Programs, Inc., and its Affiliated Debtors**

_____

Copies to:

Mark E. Felger, Esq.; Cozen O'Connor
Darryl S. Laddin, Esq., and Andrew Hamilton Ellis, Esq.; Arnall Golden Gregory LLP

*[Signature Page to Asset Purchase Agreement]*

<u>Schedule 1.1.1</u>

**CARRIER CONTRACTS**

| CARRIER/AFFILIATES | PRODUCT(S) | CONTRACTS |
|---|---|---|
| | | |
| **Breckpoint** | Stoploss for MEC plans | • Member Plan Master Trust Adoption Agreement<br>• Declaration of Trust for Member Plan Master Trust Adoption Agreement<br>• Business Associate Agreement |
| **The CHUBB USA Companies**:<br><br>**-ACE American Insurance Company**<br><br>**-Federal Insurance Company** | GAP | • Agency and Claims Administration Agreement<br>• Business Associate Agreement |
| **Everest** | GAP and Limited Medical | • Business Associate Agreement |
| **Markel Insurance Company**:<br><br>**-Markel Service Incorporated** (affiliated underwriting and business manager for Markel Insurance Company_<br><br>**- Nevaeh Insurance Solutions, LLC** (underwriting facility appointed by Markel Service Incorporated as its agent for supervising and managing UGP's performance and obligations under its contracts with Markel) | GAP | • Underwriting and Administrative Services Agreement<br>• Profit Sharing Compensation Agreement<br>• Quota Share Reinsurance Agreement<br>• Nevaeh Insurance Solutions Compensation Agreement<br>• Business Associate Agreement |
| **Nationwide Mutual Insurance Company** | GAP, Life/ADD, Dental, Short-term Disability,<br><br>Long-term Disability, Vision, Cashback Accident, and Cashback Hospital. | • Master Administrative Services Agreement<br>• Amendment No.1 to Order l Supplemental Health Medical Product of the Master Administrative Services Agreement<br>• Addendum to Master Administrative Services Agreement<br>• Managing Underwriting Agreement<br>• Amendment #1 to Managing Underwriting Agreement |

| CARRIER/AFFILIATES | PRODUCT(S) | CONTRACTS |
|---|---|---|
| | | • Amendment #2 to Managing Underwriting Agreement<br>• Agent Agreement<br>• Finder's Fee Agreement<br>• Business Associate Agreement |
| **ShelterPoint Insurance Company** | GAP and GAP with Rx | • Managing General Agency and Marketing Services Agreement<br>• Security Addendum to Managing General Agency and Marketing Services Agreement<br>• <br>• Amendment One to Managing General Agency and Marketing Services Agreement<br>• Amendment Two to Managing General Agency and Marketing Services Agreement<br>• Quota Share Reinsurance Agreement<br>• Mutual Non-Disclosure, Confidentiality and Proprietary Rights Agreement<br>• Business Associate Agreement |
| **ShelterPoint Life Insurance Company** | GAP and GAP with Rx | • Managing General Agency and Marketing Services Agreement<br>• Security Addendum to Managing General Agency and Marketing Services Agreement<br>• Amendment One to Managing General Agency and Marketing Services Agreement<br>• Amendment Two to Managing General Agency and Marketing Services Agreement<br>• Quota Share Reinsurance Agreement<br>• Mutual Non-Disclosure, Confidentiality and Proprietary Rights Agreement<br>• Business Associate Agreement |
| **Zurich American Insurance Company** | GAP and Limited Medical | • Marketing and Benefit Administration Agreement<br>• Authority Statement and Administrative Guidelines<br>• Zurich Accident & Health Incentive Agreement |

| CARRIER/AFFILIATES | PRODUCT(S) | CONTRACTS |
|---|---|---|
| | | • Contingent Compensation Agreement<br>• Business Associate Agreement |

**TPA RECEIVABLES**

Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| 21ST CENTURY HOME HEALTH SERVICES | $ 60.25 | $ 60.25 | $ 60.25 | $ 60.25 | $ 60.25 | $ 60.25 | $ 60.25 | $ 58.25 | $ 480.00 |
| 3 Way Services Corporation | $ 25.55 | $ 25.55 | $ - | $ - | $ - | $ 26.55 | $ 26.55 | $ 26.55 | $ 130.75 |
| 33 East Car Wash LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,051.16 | $ 2,051.16 |
| A Plus Home Health Care, LLC | $ - | $ - | $ 38.55 | $ 38.55 | $ 38.55 | $ 38.55 | | | $ 154.20 |
| A WINDOW, INC. | $ - | $ - | $ - | $ 52.89 | $ 52.89 | $ 52.89 | $ 52.89 | $ 52.89 | $ 264.45 |
| A.M. Hotel Management, Inc. | $ 135.48 | $ 135.48 | $ 135.48 | $ - | $ - | $ - | $ - | $ - | $ 406.45 |
| ABD Management Corp dba Al's Corner | $ - | $ - | $ - | $ - | $ - | $ 1,010.63 | | | $ 1,010.63 |
| Acadia Windows & Doors, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 950.13 | $ 950.13 |
| Accelerated Waste Solutions of North Am | $ 244.97 | $ 244.97 | $ 244.97 | $ 244.97 | $ 209.72 | $ 209.72 | $ 209.72 | $ - | $ 1,609.04 |
| Accessicare | $ 760.85 | $ 760.85 | $ 760.85 | | | | | | $ 2,282.55 |
| Adaptive Health Services | $ 101.75 | $ 101.75 | $ 2,381.89 | | | | | | $ 2,585.39 |
| Adaptive Health Services, LLC | | | | $ - | $ 1,615.83 | $ 3,059.00 | $ 3,059.00 | $ 6,748.75 | $ 14,482.58 |
| Affectionate Home Healthcare | $ 636.79 | $ 636.79 | $ - | | | | | | $ 1,273.58 |
| Affordable Family Care | $ 70.39 | $ 70.39 | $ 72.39 | $ 72.39 | $ 72.39 | $ 72.39 | $ 72.39 | $ 72.39 | $ 575.12 |
| Alabama Council on Human Relations | | | | | $ - | $ - | $ 11,739.78 | $ 11,853.00 | $ 23,592.78 |
| Albemarle Baking Company | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 303.44 | $ 303.44 |
| Alford Construction | $ - | $ - | $ - | $ - | $ - | $ - | $ 290.40 | $ 1,985.93 | $ 2,276.33 |
| Allergy, Asthma and Clinical Immunology | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 80.18 | $ 80.18 |
| Alpha-1 Foundation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 398.98 | $ 398.98 |
| AlphaNet, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 797.97 | $ 797.97 |
| Altec Solutions, LLC / Aegis Worldwide | $ 27.45 | $ - | $ - | $ - | $ - | $ 28.45 | $ 28.45 | $ 28.45 | $ 112.80 |
| American Cable & Telephone, LLC. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,484.93 | $ 4,484.93 |
| Anesthesiologists Associated | $ 108.51 | $ 108.51 | $ 351.50 | $ 460.01 | $ 460.01 | $ 726.14 | $ 703.00 | $ 4,049.57 | $ 6,967.25 |
| Atlantic Realty Development Corp | $ 48.90 | $ 48.90 | $ 24.45 | $ - | $ 24.45 | $ 24.45 | $ 24.45 | $ 24.45 | $ 220.05 |
| Bay Star Restaurant Group, Inc. | $ - | $ 72.75 | $ 72.75 | $ 72.75 | $ - | $ 73.75 | $ 73.75 | $ 73.75 | $ 439.50 |
| Berkley Citizens, Inc. dba Unity Bay | $ - | $ - | $ - | $ - | $ 69.25 | $ 69.25 | $ 69.25 | $ 69.25 | $ 277.00 |
| Big Lots | $ 92.65 | $ - | $ - | $ 207.61 | | | | | $ 300.26 |
| Birmingham Heart Clinic | $ - | $ 18,881.88 | $ - | | | | | | $ 18,881.88 |
| Bodega Shipping Co. / Napa Valley, LLC | $ - | $ - | $ - | $ 571.80 | $ - | $ - | $ - | $ - | $ 571.80 |
| Books for Less, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,667.05 | $ - | $ 2,667.05 |
| Books-A-Million | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 68,306.10 | $ 68,306.10 |
| Boone Newsmedia, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 15,231.00 | $ 15,231.00 |
| Broadway Construction Company | $ 7.00 | $ 71.16 | $ 71.16 | $ 71.16 | $ - | $ - | $ - | | $ 220.48 |
| Brush School District RE-21 | $ - | $ - | $ - | $ - | $ - | $ 228.54 | | | $ 228.54 |
| Buffalo School District RE-4J | $ - | $ - | $ - | $ - | $ - | $ - | $ 119.58 | | $ 119.58 |
| Bunny Home Care | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 491.40 | $ 491.40 |
| BWW, Inc. dba Servpro of Birmingham | $ 261.22 | $ 261.22 | $ 261.22 | $ 261.22 | $ 261.22 | $ - | $ - | $ 5.17 | $ 1,311.27 |

# Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Camp Kudzu | $ - | $ - | $ 229.30 | $ - | $ - | $ - | $ - | $ - | $ 229.30 |
| CAR SHIELD RECONDITIONING LLC | $ - | $ - | $ - | $ 74.75 | $ 74.75 | $ 74.75 | $ 3,783.00 | $ 3,783.00 | $ 7,790.25 |
| CHAMBERS BOTTLING COMPANY LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 24,706.00 | $ 24,706.00 |
| Christian and Small LLP | | | | $ - | $ - | $ - | $ - | $ 79.03 | $ 79.03 |
| City of Prichard | $ - | $ - | $ - | $ - | $ - | $ 253.32 | $ - | $ 265.32 | $ 518.64 |
| Civil Group, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 143.50 | $ 143.50 |
| ClasTran | $ - | $ - | $ - | $ - | $ - | $ 1,154.72 | | | $ 1,154.72 |
| Clipper Petroleum Inc. | $ - | $ - | $ - | $ 258.50 | $ 258.50 | $ 258.50 | $ 258.50 | $ 258.50 | $ 1,292.50 |
| CLW, Inc. | $ - | $ - | $ - | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 279.45 |
| Collection Experts, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,248.67 | $ 1,248.67 | $ 2,497.34 |
| Community Hospital, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,309.17 | $ 2,087.37 | $ 4,396.54 |
| Cosmopolitan Staffing Services, LLC | $ - | $ - | $ - | $ - | $ 0.02 | $ - | $ - | $ - | $ 0.02 |
| Cottage Inn Franchisor, LLC | | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,283.43 | $ 1,283.43 |
| County of Huerfano La Veta School Distri | $ - | $ - | $ - | $ - | $ - | $ 1,704.32 | | | $ 1,704.32 |
| CSS Building Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 513.81 | $ 513.81 |
| Cullman County Center for the Developm | $ - | $ - | $ - | $ - | $ - | $ - | $ 444.14 | $ 3,010.99 | $ 3,455.13 |
| D.E.S. Inc., dba Durango Electrical Services & Nic | | | $ - | $ - | $ - | $ - | $ - | $ 635.85 | $ 635.85 |
| Dad,Âôs Camper Outlet | | $ - | $ - | $ - | $ - | $ - | $ 118.23 | $ 118.23 | $ 236.46 |
| Dan King Plumbing Heating & Air Conditio | $ 107.89 | $ 107.89 | $ 107.89 | $ 107.89 | $ 107.89 | $ 107.89 | $ 107.89 | $ 107.89 | $ 863.12 |
| Danieli Taranis | | | | | | | $ - | $ 4,691.37 | $ 4,691.37 |
| Dare Auto | $ 2,088.21 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,088.21 |
| Defining Home, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 134.00 | $ - | $ 134.00 |
| Dent Moses, LLP | $ 77.70 | $ 77.70 | $ 77.70 | $ 77.70 | $ 77.70 | $ 77.70 | $ - | $ - | $ 466.20 |
| Dirtbusters Janitorial Services | $ - | $ - | $ - | $ 24.55 | $ 24.55 | $ 24.55 | $ 24.55 | $ 24.55 | $ 122.75 |
| Disease Management Network | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 588.98 | $ 588.98 |
| Dog River Marina and Boat Works, Inc. | $ - | $ - | $ - | $ - | $ 829.05 | $ 5,766.57 | $ 5,782.63 | $ 5,782.63 | $ 18,160.88 |
| DOUBLE OAK COMMUNITY CHURCH | $ - | $ - | $ - | $ - | $ 4,646.72 | $ - | $ - | $ - | $ 4,646.72 |
| Eagle Printing Company | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,865.07 | $ 1,865.07 |
| Eagles Wings, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 956.07 | $ 956.07 |
| Ebersold Boatworks LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ 190.72 | $ - | $ 190.72 |
| Eckceed Eckspectations, LLC | $ - | $ 47.29 | $ 47.29 | $ 47.29 | $ 47.29 | $ 47.29 | $ 47.29 | $ 47.29 | $ 331.03 |
| Economy Linen & Towel Services | $ - | $ 10,619.54 | $ 12,099.48 | $ 5,581.44 | $ 11,351.88 | $ 5,930.92 | $ 5,879.73 | $ 13,034.74 | $ 64,497.73 |
| EDM Wire Tek | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,592.89 | $ 1,592.89 |
| EH Group Inc. | | | | | | | | $ 882.50 | $ 882.50 |
| El Mezcal Mexican Restaurant | $ 53.55 | $ 53.55 | $ - | $ - | $ 124.54 | $ 124.54 | $ 57.55 | $ 54.55 | $ 468.28 |
| Everyday Maintenance, inc | $ 344.58 | $ 2,067.48 | | | | | | | $ 2,412.06 |
| Excel Home Health Care | $ 70.89 | $ 70.89 | $ 70.89 | $ 70.89 | $ 70.60 | $ 70.60 | $ 70.60 | $ 70.60 | $ 565.96 |

Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| F & R PALLETS INC. /J & R PALLETS | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 299.45 | $ 299.45 |
| Fisher Cabinets & Flooring | | | $ - | $ - | $ - | $ - | $ - | $ 903.64 | $ 903.64 |
| FISHERS PEDIATRIC DENTISTRY LLC | $ - | $ - | $ - | $ 79.89 | $ 79.89 | $ 79.89 | $ 79.89 | $ 79.89 | $ 399.45 |
| Fleet Driver Services | $ 113.38 | $ 113.38 | $ 113.38 | $ 113.38 | $ 113.38 | $ - | $ - | $ 1.83 | $ 568.73 |
| Fly Timber Co., Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 568.75 | $ 568.75 | $ 1,137.50 |
| Frank Williams Farms, Inc. | $ 32.14 | $ 32.14 | $ 32.14 | $ 32.14 | $ 32.14 | $ 32.14 | $ 32.14 | $ 32.14 | $ 257.12 |
| Frei Hospitality Group | $ - | $ - | $ - | $ 39.00 | $ 39.00 | $ 39.00 | $ 39.00 | $ 39.00 | $ 195.00 |
| GEM Limousine Service | $ - | $ - | $ - | $ 32.15 | $ 32.15 | $ 32.15 | $ 32.15 | $ 32.15 | $ 160.75 |
| Genesis Counseling Center, Inc. | $ 75.89 | $ 75.89 | $ 81.89 | $ 81.89 | $ 81.89 | $ 81.89 | $ 81.89 | $ 81.89 | $ 643.12 |
| Gentle Shepherd Care | $ 66.89 | $ 66.89 | $ 66.89 | $ 66.89 | $ 67.89 | $ 67.89 | $ 67.89 | $ 67.89 | $ 539.12 |
| GI Associates of West Alabama, P.C. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,856.63 | $ 3,856.63 |
| Gill Grill Company | $ 1,099.73 | $ 1,232.23 | $ 330.28 | $ 98.89 | $ 98.89 | $ 197.78 | $ 197.78 | $ 448.56 | $ 3,704.14 |
| Golden Platter Foods Inc. | $ - | $ - | $ - | $ - | $ - | $ 117.75 | $ 117.75 | $ 117.75 | $ 353.25 |
| Graham C-Stores, INC | $ - | $ - | $ - | $ 21.45 | $ 21.45 | $ 21.45 | $ 21.45 | $ 21.45 | $ 107.25 |
| Grand Cypress Associates, LLC | $ - | $ - | $ - | $ 32.45 | $ 32.45 | $ 32.45 | $ 32.45 | $ 1,682.54 | $ 1,812.34 |
| Great Lakes Granite + Marble Company | $ - | $ 6.90 | $ - | | | | | | $ 6.90 |
| Great Plains Livestock Consulting, Inc. | $ 135.96 | $ 135.96 | $ 135.96 | $ 135.96 | $ 135.96 | $ 135.96 | $ - | $ - | $ 815.76 |
| Green Quest Recycling | $ - | $ - | $ - | $ - | $ - | $ - | $ 485.73 | $ - | $ 485.73 |
| Gulf Coast Restaurants | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 913.60 | $ 913.60 |
| H and H Furniture | $ 63.89 | $ 63.89 | $ 63.89 | $ 63.89 | $ 63.89 | $ 63.89 | $ 63.89 | $ 63.89 | $ 511.12 |
| Hamilton Timber LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,415.57 | $ 2,415.57 | $ 4,831.14 |
| Hands from The Heart Home Healthcare S | $ - | $ - | $ - | $ 34.55 | $ 34.55 | $ 34.55 | $ 34.55 | $ 34.55 | $ 172.75 |
| Haxtun School District RE-21 | $ - | $ - | $ - | $ - | $ - | $ - | $ 38.37 | $ 37.67 | $ 76.04 |
| HCB, Inc. | | | | | | $ - | | $ 154.78 | $ 154.78 |
| Hill Brothers Transportation, Inc. | $ - | $ - | $ - | $ 994.09 | $ - | $ - | $ - | | $ 994.09 |
| Hollywood Chrysler Plymouth, Inc. | $ 37.50 | $ 102.75 | $ 143.15 | $ 245.90 | $ 1,435.40 | $ 10,067.27 | $ 20,734.78 | $ 28,913.13 | $ 61,679.88 |
| Hospitality Management Associates LLC | $ - | $ - | $ - | $ - | $ - | $ 183.00 | $ 675.70 | $ 675.70 | $ 1,534.40 |
| Hwaseung Automotive America Holdings, | $ 291.95 | $ 291.95 | $ 291.95 | $ 291.95 | $ - | $ - | $ - | $ 742.36 | $ 1,910.16 |
| Indiantown Marine Center | $ 162.34 | $ - | $ - | $ - | $ - | $ - | $ - | $ 213.99 | $ 376.33 |
| Innovative Administrative Services | $ 204.67 | $ 219.67 | $ 219.67 | $ 219.67 | $ 219.67 | $ 219.67 | $ 219.67 | $ 219.67 | $ 1,742.36 |
| Integrated Solutions for Systems | $ - | $ - | $ - | $ - | $ - | $ 175.14 | $ - | | $ 175.14 |
| International Turbine Services | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,387.15 | $ 2,387.15 |
| Intracoastal Labs, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 357.41 | $ 357.41 |
| IPS Custom Automation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,377.15 | $ 2,377.15 |
| Ivy Creek of Elmore, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 61,621.32 | $ 61,621.32 |
| Jhohman LLC dba Lagarda Security | $ - | $ - | $ - | $ 67.89 | $ 67.89 | $ 67.89 | $ 5,079.06 | $ 67.89 | $ 5,350.62 |
| John Galt Insurance Agency | $ - | $ - | $ 1,053.14 | $ 1,053.14 | $ 1,053.14 | $ 1,053.14 | $ - | $ - | $ 4,212.56 |

Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Johnson Investment Company DBA Mr. Appliance | | | | | | | $ 754.90 | $ 754.90 | $ 1,509.80 |
| Joyce Foods, Inc. dba Joyce Farms | $ - | $ - | $ - | $ - | $ - | $ 1,001.96 | $ 1,845.89 | | $ 2,847.85 |
| Keefe Memorial Health Service District | $ - | $ - | $ - | $ - | $ - | $ - | $ 119.15 | $ 128.00 | $ 247.15 |
| Keyser Enterprises | $ 56.89 | $ 56.89 | $ 56.89 | $ 56.89 | $ 56.89 | $ 56.89 | $ 56.89 | $ 113.78 | $ 512.01 |
| KPK Technologies | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,238.18 | $ 2,238.18 |
| L.V. Management, Inc DBA Joe Vicari Rest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 9,175.29 | $ 9,175.29 |
| LABOR TEAM USA, INC. | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 55.89 | $ 447.12 |
| Lehigh Valley Human Services, LLC | $ - | $ - | $ 4,455.15 | $ 77.75 | $ 77.75 | $ 77.75 | $ 77.75 | $ 77.75 | $ 4,843.90 |
| Lending a Hand Home Care | $ - | $ 504.16 | $ 504.16 | | | | | | $ 1,008.32 |
| Liberty Glass and Glazing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,399.92 | $ 1,399.92 |
| Lion's Pride Restaurant, Inc. | $ 39.14 | $ 39.14 | $ 39.14 | $ 39.14 | $ 39.14 | $ 39.14 | $ 40.14 | $ 40.14 | $ 315.12 |
| Magnolia Health Systems | $ 67.44 | | | | | | | | $ 67.44 |
| Maintenance Unlimited, Inc. | $ - | $ - | $ - | $ 50.89 | $ 50.89 | $ 50.89 | $ 50.89 | $ 50.89 | $ 254.45 |
| McDowell Knight Roedder & Sledge LLC | $ 76.60 | $ 76.60 | $ 76.60 | $ 76.60 | $ 76.60 | $ 76.60 | $ 76.60 | | $ 536.20 |
| MCF Industries, Inc. | $ - | $ - | $ - | $ - | $ - | $ 130.71 | $ - | $ - | $ 130.71 |
| Miami Beef | $ 77.89 | $ 76.89 | $ 76.89 | $ 76.89 | $ 76.89 | $ 76.89 | $ 76.89 | $ 76.89 | $ 616.12 |
| Midsouth Steel, LLC | $ 344.96 | $ 344.96 | $ 346.96 | $ 346.96 | $ 346.96 | $ 346.96 | $ - | $ 11.77 | $ 2,089.53 |
| Mid-State Specialty Eggs LLC | $ - | $ 53.75 | $ 53.75 | $ 58.75 | $ 58.75 | $ 58.75 | $ 58.75 | $ 58.75 | $ 401.25 |
| Miguel A. Elias A Professional Law corporation | | | | | | | $ 4,440.57 | $ 4,440.57 | $ 8,881.14 |
| Miller Logistics Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,727.08 | | $ 3,727.08 |
| Mississippi Security Police | $ 80.75 | $ 80.75 | $ 80.75 | $ 80.75 | $ 80.75 | $ 80.75 | $ 160.67 | $ 2,722.95 | $ 3,368.12 |
| Monroe County Hospital | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,689.91 | $ 10,689.91 |
| MORRIS-SHEA BRIDGE COMPANY INC | $ - | $ - | $ - | $ - | $ - | $ 2.25 | | | $ 2.25 |
| Morton Mechanical, Inc | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 130.49 | $ 130.49 |
| MRK Group, LLC | $ - | $ - | $ 1,792.05 | $ - | | | | | $ 1,792.05 |
| MTS of Jacksonville LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,562.34 | $ 1,562.34 |
| Munroe Haas, P.A. | | | | | $ - | $ 1,206.44 | $ 911.66 | $ 911.66 | $ 3,029.76 |
| Music Road Hotel, LLC | $ 71.89 | $ 71.89 | $ 71.89 | $ 71.89 | $ - | $ - | $ 71.89 | $ 71.89 | $ 431.34 |
| N. G. Heimos Greenhouse | $ - | $ 48.89 | $ 48.89 | $ 48.89 | $ 48.89 | $ 48.89 | $ 48.89 | $ 2,763.84 | $ 3,057.18 |
| Newby Management | $ 54.75 | $ 54.75 | $ 54.75 | $ 54.75 | $ 54.75 | $ 54.75 | $ 54.75 | $ 750.25 | $ 1,133.50 |
| Nomad Medical Services | $ - | $ - | $ - | $ - | $ 364.03 | $ - | $ - | $ - | $ 364.03 |
| North East Talent Solutions | $ - | $ - | $ - | $ - | $ - | $ 920.29 | $ 1,030.77 | $ - | $ 1,951.06 |
| Noy Property Services, LLC | $ - | $ - | $ - | $ 726.28 | $ - | $ - | $ - | $ - | $ 726.28 |
| Oakbrook Preparatory School | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,636.66 | $ 3,636.66 |
| OAX Aerospace | $ 249.08 | $ - | $ - | $ - | | | | | $ 249.08 |
| OB Joint Venture, LLC | $ - | $ - | $ - | $ - | | | $ - | $ 3,681.68 | $ 3,681.68 |
| OC Marine Services | $ 61.75 | $ 61.75 | $ 61.75 | $ - | $ - | $ 59.75 | $ 59.75 | $ 59.75 | $ 364.50 |

Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| O'Connor Enterprises, Inc. | $ 268.01 | $ 792.31 | $ 684.35 | $ - | | | | | $ 1,744.67 |
| Optus Bank | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 159.97 | $ 159.97 |
| Page Autos | $ - | $ - | $ - | $ - | $ 248.56 | $ - | $ - | $ - | $ 248.56 |
| PC Doc Services, Inc | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 234.70 | $ 234.70 |
| PCI Federal Services | $ - | $ - | $ - | $ - | $ 126.61 | $ - | $ 612.93 | $ 75,882.15 | $ 76,621.69 |
| Petersen Health Care, Inc. | $ 253.55 | $ 1,248.27 | $ 765.60 | $ 839.95 | $ 663.19 | $ 409.64 | $ 409.64 | $ 26.74 | $ 4,616.58 |
| PMP United, LLC | $ 1,851.71 | $ 1,851.71 | $ 1,933.03 | $ 1,933.03 | $ 1,933.03 | $ 1,933.03 | | | $ 11,435.54 |
| Precious Babies Learning Academy, Inc. | | | | | | | $ 689.50 | $ 689.50 | $ 1,379.00 |
| Precise Point, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 424.20 | $ 424.20 |
| Precision Grinding Inc. | $ - | $ - | | | | | | $ 11,321.47 | $ 11,321.47 |
| PRMCO Holding Company | | | $ - | $ - | $ 2,047.99 | $ - | $ - | $ 1,605.08 | $ 3,653.07 |
| Professional Maintenance Enterprises, In | $ 27.45 | $ 28.45 | $ 28.45 | $ 28.45 | $ 28.45 | $ 28.45 | $ 28.45 | $ 28.45 | $ 226.60 |
| Professional Systems Installation | $ 1,310.09 | $ 1,310.09 | $ 1,310.09 | $ 1,310.09 | $ - | | | | $ 5,240.36 |
| Professional Transportation, Inc. | $ - | $ - | $ - | $ - | $ 21.72 | $ 21.72 | $ 21.72 | $ 21.72 | $ 86.88 |
| Proviso-Leyden Council for Community A | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,795.87 | $ 3,795.87 |
| Quality Supplier Trucking | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 949.62 | $ 949.62 |
| R & M Real Estate Company, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,400.40 | $ 1,400.40 |
| R C Legnini Company, Inc. | $ - | $ - | $ 656.52 | $ 656.52 | $ - | $ - | $ - | $ - | $ 1,313.04 |
| Rago Brothers Shoe and Leather Repair | $ - | $ - | $ - | $ - | $ - | $ 52.75 | $ - | $ - | $ 52.75 |
| Rehabilitation & Neurological Services, Ll | $ - | $ - | $ - | $ - | $ 134.87 | $ 464.87 | $ 464.87 | $ 353.22 | $ 1,417.83 |
| Relative Care, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ 113.52 | $ 113.52 | $ 227.04 |
| Reliable Doors, LLC | $ - | $ - | $ 45.49 | $ - | $ - | $ 46.49 | $ 46.49 | $ 131.74 | $ 270.21 |
| Right Aid, Inc. | $ 251.56 | $ 251.56 | $ 251.56 | $ 251.56 | $ 251.56 | $ 251.56 | $ 259.56 | $ 259.56 | $ 2,028.48 |
| Riley Petroleum | $ - | $ - | $ - | $ 80.32 | $ - | $ - | $ - | $ - | $ 80.32 |
| Riviera Dining Group | $ - | $ - | $ - | $ - | $ - | $ 1,613.95 | | | $ 1,613.95 |
| RJ Mechanical, Inc. | $ - | $ 5.02 | $ 133.22 | $ 133.22 | $ - | $ - | $ - | $ - | $ 271.46 |
| Rountree Sod Service Inc | $ - | $ - | $ - | $ 158.60 | $ 158.60 | $ 158.60 | $ 158.60 | $ 158.60 | $ 793.00 |
| Royer Corporation | $ 27.45 | $ 27.45 | $ 27.45 | $ 27.45 | $ - | $ - | $ - | $ 2,063.01 | $ 2,172.81 |
| Rx Plus Management, LLC | $ 7,498.19 | $ 6,889.44 | $ 12,216.09 | $ 2,826.27 | $ 2,826.27 | $ 2,131.86 | $ 3,083.61 | $ 7,075.79 | $ 44,547.52 |
| Saras America, Inc. | $ - | $ - | $ 354.74 | $ 354.74 | $ - | $ - | $ - | $ - | $ 709.48 |
| Scafom USA, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,928.54 | $ 2,928.54 |
| Seabrook Solutions LLC | $ - | $ - | $ - | $ - | $ - | $ 2,652.09 | $ - | $ - | $ 2,652.09 |
| Sedgwick County Health Center | $ - | $ - | $ - | $ - | $ - | $ - | $ 150.07 | | $ 150.07 |
| Sejong, LLC dba Sejong Alabama | $ - | $ 116.19 | $ 128.73 | $ 128.73 | $ 128.73 | $ 128.73 | $ - | $ 24,188.97 | $ 24,820.08 |
| Shaga Consulting & Recruiting | $ - | $ - | $ - | $ 780.59 | $ - | $ - | $ - | $ - | $ 780.59 |
| Sierra Dairy | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,934.74 | $ 2,934.74 |
| Smith Family Companies, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 9,158.54 | $ 9,158.54 |

## Schedule 1.1.4(a) - Accounts Receivable

| Group | 1/1/2025 | 2/1/2025 | 3/1/2025 | 4/1/2025 | 5/1/2025 | 6/1/2025 | 7/1/2025 | 8/1/2025 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Snyder Electric | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,045.33 | $ 1,045.33 |
| Southern Line Solutions | $ - | $ - | $ - | $ 929.23 | $ - | $ - | $ - | $ - | $ 929.23 |
| Southern Metals Company | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,682.44 | $ 2,682.44 |
| Spectraforce Technologies, Inc. | $ - | $ - | $ 56.80 | $ 233.55 | $ 233.55 | $ 233.55 | $ 467.10 | $ 467.10 | $ 1,691.65 |
| SRI Technologies, Inc. | $ 61.89 | $ 61.89 | $ 61.89 | $ 61.89 | $ 61.89 | $ 61.89 | $ 61.89 | $ 61.89 | $ 495.12 |
| St Bernards Fiver Rivers | $ - | $ - | $ - | $ - | $ - | $ - | $ 11,283.99 | $ 11,538.18 | $ 22,822.17 |
| State Insurance USA | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 860.56 | $ 860.56 |
| Steel Buildings & Structures, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 6,271.94 | $ 6,271.94 |
| Steelwood Golf Development | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,426.36 | $ 2,264.85 | $ 3,691.21 |
| Sunoptics, Inc. | $ - | $ - | $ - | $ - | $ - | $ 377.63 | $ 2,410.55 | $ 2,311.07 | $ 5,099.25 |
| T & S Intermodal Maintenance, Inc. | $ - | $ - | $ - | $ - | $ 2,756.04 | $ - | $ - | $ - | $ 2,756.04 |
| Temps to the Rescue | $ 60.28 | $ 60.28 | $ 60.28 | $ 60.28 | $ 60.28 | $ 60.28 | $ 60.28 | $ 60.28 | $ 482.24 |
| The Children's Playhouse | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,215.20 | $ 1,215.20 |
| The Community House Association | $ - | $ - | $ - | $ - | $ - | $ 312.67 | $ 1,201.99 | $ 1,246.13 | $ 2,760.79 |
| The Patience Home Healthcare Service, L | $ - | $ 44.14 | $ 44.14 | $ 44.14 | $ 44.14 | $ 44.14 | $ 44.14 | $ 45.14 | $ 309.98 |
| The Radiology Clinic LLC | $ 63.22 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 63.22 |
| The Turning Point Holding Company | $ 54.89 | $ 54.89 | $ 54.89 | $ 54.89 | $ 54.89 | $ 54.89 | $ 54.89 | $ 2,245.71 | $ 2,629.94 |
| Thomas Lumping Service | $ - | $ - | $ - | $ - | $ - | $ - | $ 406.67 | $ 550.42 | $ 957.09 |
| Timothy Hall, LLC | | | | | | | $ - | $ 348.19 | $ 348.19 |
| Trinity Industrial Services | | | | | $ - | $ - | $ 1,098.24 | $ 1,098.24 | $ 2,196.48 |
| Triple G Dairy 2004 LLLP | $ - | $ - | $ - | $ 31.95 | $ 31.95 | $ 31.95 | $ 31.95 | $ 31.95 | $ 159.75 |
| Truckee Sourdough Co. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,540.88 | $ 2,540.88 |
| Twin Pines Minerals, LLC | | $ - | $ - | $ - | $ - | $ - | $ 708.19 | $ 708.19 | $ 1,416.38 |
| United Group Programs, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 94.41 | $ 94.41 |
| Uptowner Inns, Inc | | | | | | | $ - | $ 197.50 | $ 197.50 |
| V3 Aviation, LLC | $ - | $ - | $ - | $ - | $ - | $ 203.08 | $ 3,486.66 | $ 3,486.66 | $ 7,176.40 |
| Volare Assoicates LP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,091.86 | $ 1,091.86 |
| Ware Brands, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | $ 81.32 | | $ 81.32 |
| Waters Edge of Islamorado, LLC | $ - | $ - | $ - | $ 1,766.70 | | | | | $ 1,766.70 |
| Wilma Theater | $ - | $ - | $ - | $ - | $ 239.29 | $ 2,735.68 | $ 2,866.79 | $ 2,998.16 | $ 8,839.92 |
| Wiregrass Hospital / Wiregrass Medical C | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,187.19 | $ 18,223.01 | $ 19,410.20 |
| YKY Southern Restaurant Group, LLC | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 661.27 | $ 661.27 |
| **TOTAL** | | | | | | | | | **$ 903,226.50** |

<u>Schedule 1.1.4(b)</u>

**TPA ACCOUNTS**

## Schedule 1.1.4(b) - Account Balances

| Account Number | Account Name | Balance (9.15.25) |
|---|---|---|
| 1710090591 | SELF-FUNDED HOLDING | ($449.42) |
| 1710102042 | SELF-FUNDED CLAIMS | $0.00 |
| 1710103230 | SELF FUNDED | $87,375.97 |
| 2840872652 | MEC COMMON CLAIMS | $139,458.82 |
| 2840872815 | SPI CLAIMS | $0.00 |
| 2840872859 | SPL PREMIUM | ($976.93) |
| 2840872870 | SPL CLAIMS | $0.00 |
| 2840872881 | EVEREST - GAP CLAIMS | $0.00 |
| 2840872892 | EVEREST - IIP PREMIUM | $0.00 |
| 2841103232 | BRECKPOINT / FUSION RE RESERVES | $104,899.92 |
| 2841103331 | SPI LOCKBOX | $290,166.58 |
| 2841103342 | SPL LOCKBOX | $78,696.86 |
| 2841103353 | EVEREST - GIGEASY CLAIMS | $22,571.79 |
| 2841103364 | EVEREST - GAP PREMIUM | $96,386.67 |
| 2841103628 | SPI PREMIUM | ($1,712.79) |
| 2841103749 | NATIONWIDE CLAIMS | $0.00 |
| 2841103760 | CHUBB CLAIMS | $124,697.26 |
| 2841103793 | AST RISK | $5,639.94 |
| 2841103870 | EVEREST - GIGEASY PREMIUM | ($20.17) |
| 2841105641 | NATIONWIDE PREMIUM | $24,520.35 |
| 2841105652 | MULT-CARRIER PREMIUM | $522,257.69 |
| 2841105663 | PREMIUM TRUST ACCT FOR BENEFIT OF CHUBB | $63,965.31 |
| 2841105674 | WEX RESERVES | $40,338.25 |
| 3802163559 | MARKEL PREMIUM TRUST ACCOUNT | $243,782.70 |
| 3802163567 | MARKEL CLAIMS TRUST ACCOUNT | $0.00 |
| 3802594053 | EVEREST - IIP CLAIMS | $24,858.82 |
| 5111015052 | ZURICH CLAIMS RESERVE | $17,138.97 |
| | **TOTAL** | **$1,883,596.59** |

**LEASES**

1. Anderson-Bailey Lease of Americus office space.
2. Harrison Properties Lease of 3145 Avalon Ridge office space.

Schedule 1.1.6

**TPA CONTRACTS**

| CONTRACTING PARTY | DESCRIPTION |
|---|---|
| 6 Degrees Health | Ancillary employer group product offering |
| Alocare / Brighthealth | Provide website for name matching in sales |
| AST | Stop loss agreement |
| Broadreach Medical Resources, Inc. | Monthly PBM costs for MEC Plans |
| Centroid Systems, LLC | SaaS - Servers to support WLT |
| Change Healthcare | Monthly Clearing House and Claims Routing Solution |
| Comcast Atlanta | Internet for main office |
| CSC | Local agent for TPA licensing |
| Cubesmart - Storage 1 - 105 | Storage space |
| Cubesmart - Storage 2 - 327 | Storage space |
| CVS Caremark | PBM for Rx Programs on MEC |
| Dell Business Credit | Laptop purchases from 2024 |
| Dropbox | UGP Software |
| ExperLogix | Software within CRM for document management |
| Fabric Labs | EDI |
| FirstHealth | Network repricing for MEC Groups |
| Formstack | Software to support claims |
| FS *jitbit.com | Software to support claims |
| FS SQL Pro | Software to support claims |
| Github, Inc. | Software for IT |
| Language Line Services | Language line services for multi-lingual customer service support |
| GoDaddy | Website Server and addresses |
| Google Cloud | UGP Software - Cloud for technology team to store development & Software |
| Gordon Document Credit | Copier/printer |
| HealthWallet | Ancillary employer group product offering |
| Henson Group | Microsoft licenses |
| Imagenet LLC | Paper-to-electronic claims conversion |
| Iron Mountain | Storage of claims docs in PA/NJ |
| ISelect MD | Teladoc vendor for GAP product |
| JFROG.COM | Software for claims support |
| Kaseya | Software for IT/Security |
| Keylink Holdings LLC | VBA claims and billing Software |
| MD Live / Me MD | Teladoc vendor for GAP product |
| Meraki Router | Main office router license fee |
| MMS Analytics | Talon - Transparency Act access for MEC plan members |
| Multiplan, INC. | Network access for MEC plan members |

| | |
|---|---|
| NewBenefits | Ancillary employer group product offering |
| NIPR | Agent appointments/verification service |
| Northern Trust Electronic Lockbox | Electronic lockbox used to collect premium payments from employers |
| Northstar Security, Inc. | Office security system |
| Optum vPay | Banking vendor (processes claims) |
| Pineland Telephone Co. | Internet for Americus Office |
| Pitney Bowes | Lease for stamp machine |
| Point Health | Ancillary products in employer space |
| Pram Insurance Services | Rx network fee for MEC customers |
| Recuro | Teladoc vendor for GAP product |
| Red-Card Systems, LLC (a/k/a Zelis) | Issuance of EOB's and claims checks |
| Shred It | Office shred bins/collection |
| Sikich LLP | Licenses for MS Dynamics (Accounting) |
| Southern Scripts | Old PBM vendor for major medical plans |
| Stratix Leasing | Copier |
| Target Defense, Inc. | IT security technology penetration testing |
| USPS (PO 1263920299 Peachtree Corners, GA) | Post office box to receive mail |
| W-9 Corrections | Quarterly fee for company to remediate provider addresses for 1099's |
| Wex Health | FSA/HSA/COBRA Platform |
| WLT Software Enterprises | Old Claims Software - Using for run out |
| Zywave | Legal reference material and documentation for health plans |

Schedule 1.1.7

**TPA FF&E**

| Count/Amount | Item Type | Description | Model Info/Serial Number |
|---|---|---|---|
| | | **Shedule 1.1.7 - Owned and Leased FF&E** | |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Serial Number - WFB213602045 |
| 1 | Electronics | 15" Sceptre Monitor | Sceptre Monitor ID Code - E205W16008AU8S24AA |
| 2 | Furniture | 2 office chairs | N/A |
| 2 | Furniture | 2 Visitor Chairs | N/A |
| 1 | Electronics | 21.5" Acer Monitor | Acer Monitor 3 Serial Number- MMLYLAA001830055D48509 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor ID Code - P38F248BDDA180 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor ID Code - J13F225BCD1110 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor S/N -UKL162102000 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Serial Number - UKL162102104 |
| 1 | Electronics | 21.5" ViewSonic Monitor | Sceptre Monitor ID Code - P02F248BAK9762 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - UKL184111227 |
| 2 | Electronics | 24" Acer Monitors | Acer Monitor 1 Serial Number - MMT4JAA00584907D8885A7, Acer Monitor 2 Serial Number - MMTGXAA001940040678 5A7 |
| 1 | Electronics | 24" ViewSonic Monitor | ViewSonic Monitor Serial Number - TCT2019C0959 |
| 2 | Electronics | 27" LG Monitors | LG Monitor 1 Serial Number - 302MXCR2L107, LG Monitor 2 Serial Number - 302MXYG2L130 |
| 1 | Electronics | Dell Desktop | Dell Desktop Serial Number - 00186257169848 |
| 1 | Furniture | LG Dishwasher | N/A |
| 1 | Furniture | Office desk | N/A |
| 1 | Furniture | Portable White Board | N/A |
| 1 | Electronics | Two 21.5" Acer Monitors | Acer Monitor 1 Serial Number - MMT4BAA00184900B092411, Acer Monitor 2 Serial Number - 72905994985 |
| 2 | Electronics | Two 21.5" ViewSonic Monitors | ViewSonic Monitor 1 Serial Number - UKL193811142, ViewSonic Monitor 2 Serial Number - UGK184110881 |
| 1 | Electronics | 15" HP Monitor | HP Monitor Serial Number - 6CM821244J |
| 1 | Electronics | 15" HP Monitor | HP Monitor 2 Serial Number - 3CQ1380V4X |
| 1 | Electronics | 15" Sceptre Monitor | Sceptre Monitor ID Code - N49J209BTQF435 |
| 1 | Electronics | 15" Sceptre Monitor | Sceptre Monitor ID Code - P03J209BAY8384 |
| 1 | Electronics | 17" HP Monitor | HP Monitor Serial Number - 6CM82123JK |
| 1 | Electronics | 17" HP Monitor | HP Monitor 1 Serial Number - 6CM7290JVB |
| 1 | Electronics | 17" Sceptre Monitor | Sceptre Monitor ID Code - P03J209BAY8391 |
| 1 | Electronics | 17" Sceptre Monitor | Sceptre Monitor ID Code - E205W16003S8CV8S25DA |
| 1 | Electronics | 17" ViewSonic Monitor | ViewSonic Serial Number - UFY181820588 |
| 1 | Electronics | 17.5" Sceptre Monitor | Sceptre 1 Id Code - P03J209BAY8029 |
| 2 | Furniture | 2 High Top Breakroom Tables | N/A |
| 2 | Furniture | 2 Office Chairs | N/A |
| 2 | Furniture | 2 visitor chairs | N/A |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Serial Number - TVT2019C0975 |
| 1 | Electronics | 21.5" Acer Monitor | Acer Monitor Serial Number - MMLX1AA0045177A4164210 |
| 1 | Electronics | 21.5" Asus Monitor | ASUS Monitor Serial Number - R2LMQS035523 |
| 1 | Electronics | 21.5" Asus Monitor | Asus Monitor Serial Number - NCLMTF131182 |
| 1 | Electronics | 21.5" Asus Monitor | Asus Monitor Serial Number - R2LMQS035522 |
| 2 | Electronics | 21.5" Asus Monitors | Asus Monitor 1 Serial Number - NCLMTF131252, Asus Monitor 2 Serial Number - NCLMTF131244 |
| 1 | Electronics | 21.5" Dell Monitor | Dell Monitor Serial Number - CN07DWHJTV10088K1CFIA04 |
| 1 | Electronics | 21.5" hp monitor | HP Serial Number - 6CM8212582 |
| 1 | Electronics | 21.5" HP Monitor | HP Monitor S/N - 6CM7510J6Z |
| 1 | Electronics | 21.5" Hp monitor | HP Monitor Serial Number - 6CM925OZ1F |
| 1 | Electronics | 21.5" HP Monitor | HP Serial Number - 6CM8212499 |
| 1 | Electronics | 21.5" HP Monitor | HP Monitor Serial Number - C6M8212570 |
| 1 | Electronics | 21.5" HP Monitor | HP Monitor Serial Number - 6CM8270VQX |
| 2 | Electronics | 21.5 HP Monitors | HP Monitor 1 Serial Number - 6CM8160JNO, HP Monitor 2 Serial Number - 6CM22700KC |
| 2 | Electronics | 21.5" HP Monitors | HP Monitor 1 Serial Number - 6CM9330FL7, HP Monitor 2 Serial Number - 6CM8160JVZ |
| 2 | Electronics | 21.5" hp monitors | HP 1 Serial Num - 6CM82123WR, HP 2 Serial Num - 6CM8270VJP |
| 1 | Electronics | 21.5" LG Monitor | LG Monitor Serial Number - 401NTXR8T650 |

| Count/Amount | Item Type | Description | Model Info/Serial Number |
|---|---|---|---|
| | | **Shedule 1.1.7 - Owned and Leased FF&E** | |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre 2 Id Code - P13F248BTXC552 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor ID Code - N60F248BTDH431 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor ID Code - P02F248BAK9756 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor ID Code - K36F248BTD0192 |
| 1 | Electronics | 21.5" Sceptre Monitor | Scepter Monitor ID Code - N43F249BTDG227 |
| 1 | Electronics | 21.5" Sceptre Monitor | Sceptre Monitor Serial Number - P40F248BTD8502 |
| 1 | Electronics | 21.5" Sceptre Monitor | ViewSonic Monitor Serial Number - WE32204A0269 |
| 2 | Electronics | 21.5" Sceptre Monitors | Sceptre Monitor 1 ID Code - P02F248BAK6858, Sceptre Monitor 2 ID Code - P20F248BDDB068 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Serial Number - V1X202541109 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - 6CM82123L6 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - UKL162102625 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - UPA192505911 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - VMU213520596 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - UFY181820597 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Serial Number - WE32151A0236 |
| 1 | Electronics | 21.5" ViewSonic Monitor | ViewSonic Monitor Serial Number - V1X205241108 |
| 3 | Electronics | 22" ViewSonic Monitors | ViewSonic 1 Serial Number - UPA192505927, ViewSonic 2 Serial Number - UKL162102626,ViewSonic 3 Serial Number - WE3211522660 |
| 1 | Electronics | 22.5" sceptre monitor | Sceptre ID Code - P38F248BDDA172 |
| 2 | Electronics | 22.5" Sceptre Monitors | Sceptre 1 ID Code - P38F248BDDA171, Sceptre 2 ID Code - K39F248BTD1176 |
| 1 | Electronics | 24" LG Monitor | LG Monitor Serial Number - 401NTPC8T656 |
| 2 | Electronics | 24" LG Monitors | LG Monitor 1 Serial Number - 202NTDVAS562, LG Monitor 2 Serial Number - 202NTWGAS498 |
| 1 | Electronics | 24" Sceptre Monitor | Sceptre ID Code - P06F279BDQF319 |
| 1 | Electronics | 24" Sceptre Monitor | Sceptre Monitor ID Code - R26F275BTYB434 |
| 2 | Electronics | 24" Sceptre monitors | Monitor 1 ID code - N59F248BTK9282, Monitor 2 ID code - N59F248BTK9273 |
| 1 | Electronics | 24" ViewSonic Monitor | ViewSonic Monitor Serial Number - UKL184111584 |
| 1 | Electronics | 24" ViewSonic Monitor | ViewSonic Monitor Serial Number - WFB211602124 |
| 3 | Electronics | 24" ViewSonic Monitors | ViewSonic Monitor 1 Serial Number - V1X205241098, ViewSonic Monitor 2 Serial Number - WE32204A0283, ViewSonic Monitor 3 Serial Number - V1X210843854 |
| 2 | Electronics | 27" LG Monitors | LG Monitor 1 Serial Number - 202NTQDAS364, LG Monitor 2 Serial Number - 202NTXRAS546 |
| 1 | Electronics | 32" Toshiba Fire TV | TV code - G5T1M9002144003W |
| 1 | Electronics | 40" Onn TV | Onn TV Serial Number- HP917445-0011838 |
| 1 | Electronics | 40" Pioneer TV | Pioneer TV Serial Number - L398P83B230582 |
| 1 | Electronics | 40" Toshiba Tv | Toshiba Serial Number - J43A573A051701 |
| 1 | Electronics | 42" Sceptre tv | Sceptre TV Serial Number - I36H505BCC2875 |
| 1 | Electronics | 42" Sceptre TV | Sceptre TV Serial Num - I36H505BCC2874 |
| 2 | Electronics | 50" fire TVs | N/A |
| 1 | Electronics | 55" LG TV | LG TV Serial Number - N/A |
| 1 | Electronics | 55" Samsung TV | N/A |
| 1 | Electronics | 60" Fire TV | N/A |
| 9 | Furniture | 9 office chairs | N/A |

| | | Shedule 1.1.7 - Owned and Leased FF&E | |
|---|---|---|---|
| Count/Amount | Item Type | Description | Model Info/Serial Number |
| 17 | Furniture | Dell Desktops | Desktop 1 S/N - 00186209475814, Desktop 2 S/N - 00186214565444, Desktop 3 S/N - 00186214565431, Desktop 4 S/N - 00186214565441, Desktop 5 S/N - CNH7030XP8, Desktop 6 S/N - 00186214565807, Desktop 7 S/N - 00186214565447, Desktop 8 S/N - 00186214684641, Desktop 9 S/N - 00186271833947, Dekstop 10 S/N - 00186214565429, Desktop 11 S/N - 00186214565442, Desktop 12 S/N - 00186209475786, Desktop 13 S/N - 42664914145, Desktop 14 S/N - 00186214565445, Desktop 15 S/N - CN04W34Y7016357103RQA00, Desktop 16 S/N - CN0MTX7T710703BB0060A01, Desktop 17 S/N - 00186214565430 |
| 1 | Furniture | desk chair | N/A |
| 3 | Computer Hardware | Edgeswitches | N/A |
| 1 | Furniture | Farberware Toaster | N/A |
| 1 | Computer Hardware | Fujitsu Scan Machine | Fujitsu Serial Number - A2JDC06592 |
| 9 | Furniture | High Top Chairs | N/A |
| 6 | Furniture | High Top Office Chairs | N/A |
| 1 | Computer Hardware | HP Laser Jet Pro MFP 3101fdw | HP LaserJet Pro Serial Number - VND3B38567 |
| 1 | Furniture | LG Refridgerator | N/A |
| 6 | Furniture | lobby chairs | N/A |
| 1 | Furniture | long conference table | N/A |
| 1 | Equipment | Martin Yale Mail Slicer | Mail Slicer Serial Number - 39625.01292.R40, |
| 1 | Furniture | Medium Conference table | N/A |
| 2 | Electronics | meeting polycom conference phones | N/A |
| | | N/A | N/A |
| | | N/A | N/A |
| 1 | Furniture | office chair | N/A |
| 1 | Furniture | Office chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |

| Count/Amount | Item Type | Description | Model Info/Serial Number |
|---|---|---|---|
| | | **Shedule 1.1.7 - Owned and Leased FF&E** | |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 1 | Furniture | Office Chair | N/A |
| 2 | Furniture | Office Chairs | N/A |
| 1 | Furniture | office desk | N/A |
| 1 | Furniture | office desk | N/A |
| 1 | Furniture | office desk | N/A |
| 1 | Furniture | Office desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 1 | Furniture | Office Desk | N/A |
| 2 | Furniture | Office Desks | N/A |
| 1 | Furniture | Office DeskThree | N/A |
| N/A | Office Supplies | Office Supplies | N/A |
| 1 | Furniture | Oster Microwave | N/A |
| 17 | Electronics | polycom desk phones | N/A |
| 1 | Equipment | Ricoh IM 2500 print,scn,fax machine | Ricoh Serial Number - 4414R630115 |
| 1 | Equipment | Ricoh IM C530FB prt,scn,fax machine | Ricoh Serial Number - VN062K303813222200000103 |
| 1 | Furniture | round coffee table | N/A |
| 2 | Computer Hardware | Routers | N/A |
| 1 | Furniture | TV Wall Mount | N/A |
| 2 | Electronics | Two 21.5'' Acer Monitors | Acer Monitor 1 S/N - MMLWAAA0015105B42E8527, Acer Monitor 2 S/N - MMLYLAA0018300538F8509 |
| 2 | Electronics | Two 21.5'' HP Monitors | HP Monitor 1 Serial Number - 3CQ1380V59, HP Monitor 2 Serial Number - 6CM6250GVK |
| 2 | Electronics | Two 21.5'' Sceptre Monitors | Sceptre Monitor 1 ID Code - Q50F248BTD3659, Sceptre Monitor 2 ID Code - Q33F248TY6994 |
| 2 | Electronics | Two 21.5'' ViewSonic Monitors | ViewSonic Monitor 1 - UPA195210698, ViewSonic Monitor 2 - UPA195210703 |
| 2 | Electronics | Two 21.5'' ViewSonic Monitors | ViewSonic Monitor 1 Serial Number - VMU213520607, ViewSonic Monitor 2 Serial Number - V1X210843861 |
| 1 | Electronics | ViewSonic 21.5'' Monitor | ViewSonic Monitor Serial Number - WE32204A0268 |
| 1 | Furniture | Visitor Chair | N/A |
| 1 | Furniture | Visitor Chair | N/A |
| 1 | Furniture | Visitor Chair | N/A |
| 1 | Furniture | Visitor Chair | |
| 2 | Furniture | visitor chairs | N/A |
| 2 | Furniture | Visitor Chairs | N/A |

| Count/Amount | Item Type | Description | Model Info/Serial Number |
|:---:|:---:|:---|:---|
| 2 | Furniture | Visitor Chairs | N/A |
| 3 | Furniture | Visitor Chairs | N/A |
| 2 | Furniture | Visitor Chairs | N/A |
| 2 | Furniture | Visitor Chairs | N/A |
| 1 | laptop | Dell Inspiron 2023 | 33603371607 |
| 1 | laptop | dell vostro 2022 | 12129822291 |
| 1 | laptop | dell vostro | unreadable |
| 1 | laptop | dell vostro 2022 | 1290288436 |
| 1 | laptop | dell vostro 2022 | 33062747943 |
| 1 | laptop | dell vostro 2022 | 6872322151 |
| 1 | laptop | dell vostro 2022 | 33076525719 |
| 1 | laptop | Dell Latidue 3540 2024 | 3825700024 |
| 1 | laptop | dell vostro 2021 | 34836287476 |
| 1 | laptop | dell vostro 2022 | 26278182759 |
| 1 | laptop | Dell Latidue 3540 2024 | 16402664632 |
| 1 | laptop | dell vostro 2022 | 47971578741 |
| 1 | laptop | dell vostro 2022 | 34085050887 |
| 1 | laptop | Dell Latidue 5330 2023 | 15706209639 |
| 1 | laptop | dell vostro 2022 | 19089439239 |
| 1 | laptop | dell vostro 2021 | 20794048419 |
| 1 | laptop | dell vostro 2021 | 20794048419 |
| 1 | laptop | IBM Thinpad 2016 | PF-1muzvw |
| 1 | laptop | dell vostro | Unreadable |
| 1 | laptop | dell vostro | Unreadable |
| 1 | laptop | dell vostro 2022 | 10805560167 |
| 1 | laptop | Dell Inspiron 2023 | 16678114455 |
| 1 | laptop | dell vostro 2022 | 38723707119 |
| 1 | laptop | IBM Thinpad 2016 | R4001619u |
| 1 | laptop | dell vostro 2022 | 3258855143 |
| 1 | laptop | Dell Vostro 2023 | 3489657267 |
| 1 | laptop | Dell Latidue 3540 2024 | 24090914871 |
| 1 | laptop | dell vostro 2022 | 55994705283 |
| 1 | laptop | dell vostro 2021 | 10782844743 |
| 1 | laptop | Dell Inspiron 2023 | 56615131111 |
| 1 | laptop | Dell Vostro 2023 | 24489726015 |
| 1 | laptop | dell vostro 2021 | 44663534233 |
| 1 | laptop | dell vostro 2022 | 16688023079 |
| 1 | laptop | IBM Thinpad 2016 | PD-2zxuws |

Shedule 1.1.7 - Owned and Leased FF&E

<u>Schedule 5.2.3</u>

**SPECIFIED TPA CONTRACTS**

| CONTRACTING PARTY | DESCRIPTION |
|---|---|
| Broadreach Medical Resources, Inc. | PBM for Rx Programs on MEC Plans |
| Change Healthcare | Clearing House and Claims Routing Solution |
| CVS Caremark | PBM for Rx Programs on MEC Plans |
| Dell Business Credit | Laptops purchased in 2024 |
| FirstHealth | Network repricing for MEC Groups |
| Google Cloud | UGP Software - Cloud for IT team to store development & software |
| Imagenet LLC | Paper-to-electronic claims conversion |
| Keylink Holdings LLC | VBA claims and billing software |
| Multiplan, INC. | Network access for MEC plan members |
| Pram Insurance Services | Rx network for MEC customers |
| Red-Card Systems, LLC (a/k/a Zelis) | Issuance of EOB's and claims checks |

Exhibit A

**ASSUMPTION AND ASSIGNMENT AGREEMENT**

# ASSUMPTION AND ASSIGNMENT AGREEMENT

THIS ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [●], 2025 (the "Effective Date"), is made by and between the interim Chapter 7 trustee (the "Trustee") for the estates (the "Estates") of (i) United Group Programs, Inc., a Delaware corporation ("UGP"), (ii) UPG Buyer, Inc., a Delaware corporation ("UGP Buyer"), and (iii) UPG Holdings, Inc., a Delaware corporation ("UGP Holdings" and, together with UGP and UGP Buyer, collectively, the "Debtors"), and CarynHealth Management Services LLC, a Delaware corporation ("Assignee"). Trustee and Assignee are sometimes referred to herein individually as a "party" and collectively, as the "parties."

WHEREAS, on August 15, 2025, the Debtors filed voluntary petitions under Chapter 7 of the Title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, subsequent thereto, the Trustee was appointed as interim Chapter 7 trustee for the Estates;

WHEREAS, the Trustee filed that certain *Trustee's Motion for Order: (A) Approving the Sale of Certain of the Assets of the Estates Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(B) and (F); (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant To 11 U.S.C. § 365; and (C) Granting Related Relief* with the Bankruptcy Court on September 17, 2025 (as such motion may hereafter be amended by the Trustee and approved by final order of the Bankruptcy Court, the "Sale Motion"), pursuant to which the Trustee sought Bankruptcy Court authority to sell certain of the Estates' assets relating to the group plan third party administrator (TPA) business conducted by the Debtors under the "OptiMed Health" brand;

WHEREAS, in connection with the Sale Motion, the Trustee and Assignee entered into that certain Asset Purchase Agreement, dated as of September 21, 2025 (the "APA") (capitalized terms used but not defined herein having the meanings ascribed thereto in the APA); and

WHEREAS, in furtherance of the transactions contemplated by the APA, and subject to the terms and conditions set forth therein, the Trustee desires to sell, transfer and convey to Assignee all of Estates' right, title and interest in and to all of the Purchased Assets (but for the avoidance of doubt, excluding the Excluded Assets), including all of the Estates' right, title and interest in and to, and all duties, liabilities and obligations under, the Designated Contracts (other than the Leases), the TPA Receivables, the TPA Accounts, and the TPA Business Records, and Assignee desires to accept and assume such assignment pursuant to the terms and conditions set forth below, all pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to the terms and conditions of the APA;

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignment and Assumption.  Effective as of the Closing, (a) Trustee hereby sells, assigns, grants, conveys and transfers to Assignee, and Assignee hereby accepts and acquires, all of the Estates' right, title and interest in and to the Designated Contracts (other than the Leases), the TPA Receivables, the TPA Accounts, and the TPA Business Records, and (b) Assignee hereby accepts such assignment and acquires and assumes all of the Assumed Liabilities in respect of the Designated Contracts (other than the Leases), the TPA Receivables, the TPA Accounts, and the TPA Business Records, in each case pursuant to 11 U.S.C. §§ 363 and 365.  For the avoidance of doubt, Assignee is not assuming any Excluded Liabilities.

2. <u>Free and Clear of Liens and Encumbrances</u>. Pursuant and subject to the Sale Order, Assignee shall take title to each of the Designated Contracts (other than the Leases), the TPA Receivables, the TPA Accounts, and the TPA Business Records free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability).

3. <u>APA</u>. The parties hereto acknowledge and agree that the rights, obligations, terms, or conditions contained in the APA shall not be superseded or otherwise be affected hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the APA and the terms hereof, the terms of the APA shall govern.

4. <u>Incorporated Terms</u>. Sections 2.2 (*Further Conveyances and Assumptions*), 6.1.2 (*Disclaimer of Representations and Warranties*), 12.2 (*Governing Law; Jurisdiction*), 12.6 (*Severability*), 12.7 (*Notices*), 12.8 (*Amendments; Waivers*), and 12.12 (*Parties in Interest*) of the APA are hereby incorporated herein in their entirety by reference and shall form part of this Agreement as if fully set forth herein, *mutatis mutandis*.

5. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of Page Intentionally Blank – Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first set forth above.

TRUSTEE:

_____
Jami Nimeroff, as Chapter 7 Trustee of United Group Programs, Inc., and its Affiliated Debtors

ASSIGNEE:

**CarynHealth Management Services LLC,**

a Delaware limited liability company

By: _____
Name:
Title:

**ASSIGNMENT OF LEASE**

# ASSUMPTION AND ASSIGNMENT OF LEASES

This ASSUMPTION AND ASSIGNMENT OF LEASES (this "Agreement") dated as of [●], 2025 (the "Effective Date"), is made by and between the interim Chapter 7 trustee (the "Trustee") for the estates (the "Estates") of (i) United Group Programs, Inc., a Delaware corporation ("UGP"), (ii) UPG Buyer, Inc., a Delaware corporation ("UGP Buyer"), and (iii) UPG Holdings, Inc., a Delaware corporation ("UGP Holdings" and, together with UGP and UGP Buyer, collectively, the "Debtors"), and CarynHealth Management Services LLC, a Delaware corporation ("Assignee"). Trustee and Assignee are sometimes referred to herein individually as a "party" and collectively, as the "parties."

## RECITALS

**WHEREAS**, on August 15, 2025, the Debtors filed voluntary petitions under Chapter 7 of the Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, subsequent thereto, the Trustee was appointed as interim Chapter 7 trustee for the Estates;

**WHEREAS**, the Trustee filed that certain *Trustee's Motion for Order: (A) Approving the Sale of Certain of the Assets of the Estates Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(B) and (F); (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant To 11 U.S.C. § 365; and (C) Granting Related Relief* with the Bankruptcy Court on September 17, 2025 (as such motion may hereafter be amended by the Trustee and approved by final order of the Bankruptcy Court, the "Sale Motion"), pursuant to which the Trustee sought Bankruptcy Court authority to sell certain of the Estates' assets relating to the group plan third party administrator (TPA) business conducted by the Debtors under the "OptiMed Health" brand;

**WHEREAS**, in connection with the Sale Motion, the Trustee and Assignee entered into that certain Asset Purchase Agreement, dated as of September 21, 2025 (the "APA"; capitalized terms used but not defined herein having the meanings ascribed thereto in the APA); and

**WHEREAS**, in furtherance of the transactions contemplated by the APA, and subject to the terms and conditions set forth therein, the Trustee desires to sell, transfer and convey to Assignee all of Estates' right, title and interest in and to all of the Purchased Assets (but for the avoidance of doubt, excluding the Excluded Assets), including all of the Estates' right, title and interest in and to, and all duties, liabilities and obligations under, the Leases, and Assignee desires to accept and assume such assignment pursuant to the terms and conditions set forth below, all pursuant to Section 365 of the Bankruptcy Code and subject to the terms and conditions of the APA;

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Assignment and Assumption.  Effective as of the Closing, (a) Trustee hereby sells, assigns, grants, conveys and transfers to Assignee, and Assignee hereby accepts and acquires, all of the Estates' right, title and interest in and to the Leases, including all security deposits paid by any Debtor with respect to any Lease prior to the Petition Date, and (b) the Assignee assumes all of the Assumed Liabilities in respect of the Leases, in each case pursuant to 11 U.S.C. § 365. For the avoidance of doubt, Assignee is not assuming any Excluded Liabilities.

2.  Free and Clear of Liens and Encumbrances. Pursuant and subject to the Sale Order, Assignee shall take title to each Lease free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability).

3.  APA. The parties hereto acknowledge and agree that the rights, obligations, terms, or conditions contained in the APA shall not be superseded or otherwise be affected hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the APA and the terms hereof, the terms of the APA shall govern.

4.  Incorporated Terms.  Sections 2.2 (*Further Conveyances and Assumptions*), 6.1.2, (*Disclaimer of Representations and Warranties*), 12.2 (*Governing Law; Jurisdiction*), 12.6 (*Severability*), 12.7 (*Notices*), 12.8 (*Amendments; Waivers*), and 12.12 (*Parties in Interest*) of the APA are hereby incorporated herein in their entirety by reference and shall form part of this Agreement as if fully set forth herein, *mutatis mutandis*.

5.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of Page Intentionally Blank – Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first set forth above.

**TRUSTEE:**

_____
Jami Nimeroff, as Chapter 7 Trustee of
United Group Programs, Inc., and its Affiliated
Debtors

**ASSIGNEE:**

**CarynHealth Management Services LLC,**

a Delaware limited liability company

By: _____
Name:
Title:

Exhibit C

**BILL OF SALE**

**BILL OF SALE**

THIS BILL OF SALE (this "<u>Bill of Sale</u>"), dated as of [●], 2025 (the "<u>Effective Date</u>"), is made by the interim Chapter 7 trustee (the "<u>Trustee</u>") for the estates (the "<u>Estates</u>") of (i) United Group Programs, Inc., a Delaware corporation ("<u>UGP</u>"), (ii) UPG Buyer, Inc., a Delaware corporation ("<u>UGP Buyer</u>"), and (iii) UPG Holdings, Inc., a Delaware corporation ("<u>UGP Holdings</u>" and, together with UGP and UGP Buyer, collectively, the "<u>Debtors</u>"), in favor of CarynHealth Management Services LLC, a Delaware corporation (the "<u>Buyer</u>").

**WHEREAS**, on August 15, 2025, the Debtors filed petitions under Chapter 7 of the Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and, subsequent thereto, the Trustee was appointed as interim Chapter 7 trustee for the Estates;

**WHEREAS**, the Trustee filed that certain *Trustee's Motion for Order: (A) Approving the Sale of Certain of the Assets of the Estates Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(B) and (F); (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant To 11 U.S.C. § 365; and (C) Granting Related Relief* with the Bankruptcy Court on September 17, 2025 (as such motion may hereafter be amended by the Trustee and approved by final order of the Bankruptcy Court, the "<u>Sale Motion</u>"), pursuant to which the Trustee sought Bankruptcy Court authority to sell certain of the Estates' assets relating to the group plan third party administrator (TPA) business conducted by the Debtors under the "OptiMed Health" brand;

**WHEREAS**, in connection with the Sale Motion, the Trustee and Assignee entered into that certain Asset Purchase Agreement, dated as of September 21, 2025 (the "<u>APA</u>") (capitalized terms used but not defined herein having the meanings ascribed thereto in the APA); and

**WHEREAS**, in furtherance of the transactions contemplated by the APA, and subject to the terms and conditions set forth therein, the Trustee desires to sell, transfer and convey to Assignee all of the Estates' right, title and interest in and to all of the Purchased Assets (but for the avoidance of doubt, excluding the Excluded Assets), including all of the Estates' right, title and interest in and to the TPA FF&E, and Assignee desires to purchase and accept the same pursuant to the terms and conditions set forth below, all pursuant to Section 363 of the Bankruptcy Code and subject to the terms and conditions of the APA;

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Trustee hereby agrees as follows:

1.     <u>Sale and Assignment of TPA FF&E</u>. Subject to the terms and conditions set forth herein and in the APA, the Trustee hereby irrevocably sells, assigns, transfers, conveys, grants, bargains, and delivers to the Buyer and its successors and assigns, forever, all of the Estates' right, title and interest in and to the TPA FF&E, in each case pursuant to 11 U.S.C. § 363.

2.     <u>Excluded Assets Not Assigned</u>.  Notwithstanding anything herein to the contrary, the Excluded Assets are specifically excluded from the TPA FF&E and will be retained by the Estates at and following the Closing.

3.     <u>Free and Clear of Liens and Encumbrances</u>. Pursuant and subject to the Sale Order, Assignee shall take title to the TPA FF&E free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability).

4.     <u>Assignment Subject to APA</u>. The rights, obligations, terms, or conditions contained in the APA shall not be superseded or otherwise be affected hereby but shall remain in full force and effect to the

full extent provided therein.  In the event of any conflict or inconsistency between the terms of the APA and the terms hereof, the terms of the APA shall govern.

     5.  <u>Incorporated Terms</u>.  Sections 2.2 (*Further Conveyances and Assumptions*), 6.1.2 (*Disclaimer of Representations and Warranties*), 12.2 (*Governing Law; Jurisdiction*), 12.6 (*Severability*), and 12.8 (*Amendments; Waivers*) of the APA are hereby incorporated herein in their entirety by reference and shall form part of this Bill of Sale as if fully set forth herein, *mutatis mutandis*.

[*Remainder of Page Intentionally Blank – Signature Page Follows*]

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Bill of Sale as of the date first set forth above.

**TRUSTEE:**

_____
Jami Nimeroff, as Chapter 7 Trustee of
United Group Programs, Inc., and its Affiliated
Debtors

**IP ASSIGNMENT**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [●], 2025 (the "Effective Date"), is made by and between the interim Chapter 7 trustee (the "Trustee") for the estates (the "Estates") of (i) United Group Programs, Inc., a Delaware corporation ("UGP"), (ii) UPG Buyer, Inc., a Delaware corporation ("UGP Buyer"), and (iii) UPG Holdings, Inc., a Delaware corporation ("UGP Holdings" and, together with UGP and UGP Buyer, collectively, the "Debtors"), and CarynHealth Management Services LLC, a Delaware corporation ("Assignee"). Trustee and Assignee are sometimes referred to herein individually as a "party" and collectively, as the "parties."

**WHEREAS**, on August 15, 2025, the Debtors filed petitions under Chapter 7 of the Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, subsequent thereto, the Trustee was appointed as interim Chapter 7 trustee for the Estates;

**WHEREAS**, the Trustee filed that certain *Trustee's Motion for Order: (A) Approving the Sale of Certain of the Assets of the Estates Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(B) and (F); (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant To 11 U.S.C. § 365; and (C) Granting Related Relief* with the Bankruptcy Court on September 17, 2025 (as such motion may hereafter be amended by the Trustee and approved by final order of the Bankruptcy Court, the "Sale Motion"), pursuant to which the Trustee sought Bankruptcy Court authority to sell certain of the Estates' assets relating to the group plan third party administrator (TPA) business conducted by the Debtors under the "OptiMed Health" brand;

**WHEREAS**, in connection with the Sale Motion, the Trustee and Assignee entered into that certain Asset Purchase Agreement, dated as of September 21, 2025 (the "APA") (capitalized terms used but not defined herein having the meanings ascribed thereto in the APA); and

**WHEREAS**, in furtherance of the transactions contemplated by the APA, and subject to the terms and conditions set forth therein, the Trustee desires to sell, transfer and convey to Assignee all of Estates' right, title and interest in and to all of the Purchased Assets (but for the avoidance of doubt, excluding the Excluded Assets), including all of the Estates' right, title and interest in and to, and all duties, liabilities and obligations under, the TPA IP Assets, and Assignee desires to accept and assume such assignment pursuant to the terms and conditions set forth below, all pursuant to Sections 363 and 365 of the Bankruptcy Code and subject to the terms and conditions of the APA;

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the foregoing promises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. <u>Assignment and Assumption</u>. Effective as of the Closing, the Trustee hereby sells, assigns, grants, conveys and transfers to Assignee, and Assignee hereby accepts and acquires, all of the Estates' right, title and interest in and to the TPA IP Assets, in each case pursuant to 11 U.S.C. §§ 363 and 365, including the following:

(a) all (i) U.S. and foreign trademarks, service marks, trade names, brand names, trade dress, logos, design marks, and business names owned or exclusively licensed by UGP and used in the Business, including the "OptiMed" and "OptiMed Health" marks, (ii) U.S. and foreign copyrights and other work of authorships, regardless of the medium or means of expression, including software, websites,

content, images, logos, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings and other works of authorship, whether registered or unregistered, owned or exclusively licensed by UGP, in and to the business forms, documents, materials (including marketing materials), processes and procedures used in the Business, (iii) owned and exclusively licensed intellectual property rights of UGP in and to the proprietary online quote generation and benefits administration platforms and portals operated by UGP under the "OptiRater" and "OptiAdmin" names, (iv) internet domain names, uniform resource locators, and social media accounts and handles associated with the foregoing, (v) registrations, registration applications, and renewals of the foregoing, together with all goodwill associated therewith, (vi) phone numbers used in the operation of the Business, and (vii) rights of UGP in and to the computer software, databases, and systems operated on or used by the IT systems and laptop computers included among the TPA FF&E;

(b) any and all rights of any kind whatsoever of the Estates accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions and otherwise throughout the world;

(c) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable to the Estates with respect to any and all of the foregoing; and

(d) any and all claims and causes of action available to the Estates, with respect to any of the foregoing, whether accruing before, on or after the date hereof, including all of the Estates' rights to and claims for damages, restitution and injunctive and other legal and equitable relief for past, present and future infringement, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.    <u>Recordation and Further Actions</u>. The Trustee hereby authorizes the officials of the United States Patent and Trademark Office, the U.S. Copyright Office, and corresponding entities or agencies in any applicable jurisdictions to record and register this Agreement and the assignment hereunder upon request by Assignee. Following the date hereof, upon Assignee's reasonable request and at Assignee's sole cost and expense, the Trustee shall take such steps and actions, and provide such cooperation and assistance to Assignee and its successors, permitted assigns and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be reasonably necessary to effect, evidence or perfect the assignment of the TPA IP Assets to Assignee, or any permitted assignee thereof or successor thereto.

3.    <u>Free and Clear of Liens and Encumbrances</u>. Pursuant and subject to the Sale Order, Assignee shall take title to the TPA IP Assets free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability).

4.    <u>APA</u>. The parties hereto acknowledge and agree that the rights, obligations, terms, or conditions contained in the APA shall not be superseded or otherwise be affected hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the APA and the terms hereof, the terms of the APA shall govern.

5.    <u>Incorporated Terms</u>.  Sections 2.2 (Further Conveyances and Assumptions), 6.1.2 (Disclaimer of Representations and Warranties), 12.2 (Governing Law; Jurisdiction), 12.6 (Severability), 12.7 (Notices), 12.8 (Amendments; Waivers), and 12.12 (Parties in Interest) of the APA are hereby incorporated herein in their entirety by reference and shall form part of this Agreement as if fully set forth herein, mutatis mutandis.

6.      <u>Counterparts</u>.  <u>This</u> Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of Page Intentionally Blank – Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date first set forth above.

<div style="margin-left:45%">

**TRUSTEE:**


_____
Jami Nimeroff, as Chapter 7 Trustee of United Group Programs, Inc., and its Affiliated Debtors




**ASSIGNEE:**

**CarynHealth Management Services LLC,**

a Delaware limited liability company


By: _____
Name:
Title:

</div>

Exhibit E

**STOCK POWER AND ASSIGNMENT**

## STOCK POWER AND ASSIGNMENT

FOR VALUE RECEIVED, the undersigned, being the interim Chapter 7 trustee (the "Trustee") for the estate (the "Estate") of UPG Buyer, Inc., a Delaware corporation ("UGP Buyer") and the sole record and beneficial owner of those shares of capital stock and/or units of limited liability company interest (collectively, the "Shares") of United Programs Reinsurance Company, Ltd., a limited liability company organized in the Turks and Caicos Islands (the "Company"), as set forth on **Schedule A** attached hereto, standing in the name of UGP Buyer on the books of the Company, which Shares are represented by the certificate or ledger numbers ascribed thereto on such schedule, hereby sells, assigns and transfers all of such Shares unto CarynHealth Management Services LLC, a Delaware corporation (the "Buyer"), free and clear of all liens, claims, encumbrances and other interests of third parties (including any successor liability) pursuant to Sections 105, 363, and 365 of the United States Bankruptcy Code, and does hereby irrevocably constitute and appoint each of the Secretary and the Assistant Secretary of the Company, as the true and lawful attorneys of the Estate with full powers of substitution, to reflect such sale, assignment and transfer of said Shares on the books of such Company and for that purpose to make and execute all necessary acts of sale, assignment and transfer thereof.

Dated this [●] day of September, 2025.

_____
Jami Nimeroff, as Chapter 7 Trustee of
UPG Buyer, Inc., and its Affiliated Debtors

## SCHEDULE A

### Shares

| Company | Certificate/Ledger No. | No. of Shares |
|---|---|---|
| United Programs Reinsurance Company, Ltd. | [●] | [●] |